Honorable Wm. Femming Nielsen

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF WASHINGTON

7
   UNITED STATES OF AMERICA,            NO. 2:14-CR-87-WFN
8
              Plaintiff,                MOTION IN LIMINE
9

10    v.

11  ARTHUR FRANK CARDENAS,

12            Defendant.

13
        COMES NOW, the Defendant, Arthur Cardenas, by and through his
14
   attorney, John R. Crowley, respectfully requests that this court exclude
15
   statements made by Ms. Alicia Favro to officers and exclude any testimony
16
   germane to Mr. Arthur Cardenas's tattoos as they are characterized as gang
17
   related evidence and wholly irrelevant under the charges in tis cause.
18

19                        I.   FACTS

20      On April 26, 2012, at about 6:40 A.M., Officer William Hager responded
   to reports of someone trespassing a vacant house at 1400 W. 13th Spokane, WA.
21
   *Incident Report Officer* Hager — p. 2 (hereinafter "*Hager Report*") APPENDIX
22
   A). While en route, Mr. Hager received another call of people complaining of
23  MOTION TO SUPPRESS STATEMENTS AND PHYSCIAL        The Crowley Law Firm, P.L.L.C.
   EVIDENCE - 1                                           Grand Central Building
                                                        216 First Ave. S., Ste 204
                                                        Seattle, Washington  98104
                                                   Tel (206) 625-7500 ♦ Fax (206) 625-1223

gunfire in the area of 1825W 6th Spokane, WA. *Id.* Just as he reached the address of 1400 W. 13th, a white Chevy Malibu flagged down Officer Hager. *Id.* The driver of the vehicle, later identified as Ms. Alicia Favro, informed Officer Hager that her friend, later identified as Arthur Cardenas, had been shot and needed immediate medical attention. *Id.* According to Officer Jeffrey Graves, when he arrived to assist Officer Hager, Mr. Cardenas was wearing a *black T-shirt and blue jeans. Supplemental Report, Officer Graves* – Page. 2 (hereinafter "*Graves Report*") (APPENDIX B). (Emphasis added).

After Sergeant Anthony Meyer arrived, Officer Hager took Ms. Favro aside to determine what event had led to her friend being shot. *Id.* At this time Ms. Favro told her first version of the events. *Hager Report* - p. 2.

### Ms. Favro's First story

Ms. Favro told Officer Hager that she and Mr. Cardenas were at a casino in Moses Lake where Mr. Cardenas "won big" and wanted to go to Northern Quest Casino. *Id.* Upon leaving the Moses Lake area, and not being familiar with Spokane, Mr. Cardenas allegedly told Ms. Favro to take a freeway exit. Ms. Favro said that she wanted to go to the store. *Id.*

Continuing, Ms. Favro said that after taking the exit, Mr. Cardenas told her he needed to "take a pee." *Id.* To this end, indicated to police that she stopped the car and he went into an alley. *Id.* After about two minutes she said she heard gun shots, then Mr. Cardenas ran up to her and told her he was shot and needed to go to the hospital. *Id.* After driving around for a few moments, Ms. Favro saw Officer Hager's patrol car and flagged him down. *Id.*

MOTION TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE - 2

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

1    After speaking with Ms. Favro, and having other officers on the scene,
2  Officer Hager drove Ms. Favro to the hospital. *Id* at 3. Once the two arrived at the
3  hospital, Officer Hager was radioed that Mr. Cardenas could be a "suspect," and
4  that the white Chevy Malibu was going to be impounded. *Id*. Officer Hager noted
5  that Ms. Favro looked very nervous. *Id*. He continued to question her about what
   she had seen that day. *Id*. In response to whether she had seen what the individual
6  who had shot Mr. Cardenas looked like, Ms. Favro said that she did not see
7  anybody; however, she stated that an individual had run right by her. *Id*.

8    Officer Hager noted that he believed Ms. Favro was not being forthcoming
9  and that "the lack of eye contact and her nervousness [when Officer Hager] asked
10 her about what she knew, kind of told [him] she was worried more about herself
11 and not [Mr. Cardenas]." *Id*. Working from this suspicious behavior, and on a
   "hunch," Officer Hager asked Ms. Favro if he could check her bags for weapons.
12 *Id*.

13   Ms. Favro immediately shook her head "no," and stated that she had
14 personal items in the bag that she did not want him to rummaging through. *Id*.
15 Officer Hager attempted to lead Ms. Favro to believe that "hospital rules" allowed
16 him to check her purse for weapons. *Id*. Officer Hager insinuated that due to
17 construction in the hospital, there was no weapons checkpoint which gave him the
18 authority to check Ms. Favro's purse. *Id*. Officer Hager persisted his aggressive
   questioning of Ms. Favro and unexpectedly, without Ms. Favro's consent, took
19 the purses from her grasp, stating that he believed that she was hiding a weapon
20 in one of her purses. *Id*. Ms. Favro began stating that they needed to go
21 somewhere in private and Officer Hager took her to an empty hallway not far
22 from the ER. *Id*. Ms. Favro then informed Officer Hager that after Mr. Cardenas

23 MOTION TO SUPPRESS STATEMENTS AND PHYSICAL
   EVIDENCE - 3

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

1  was shot she saw a handgun on the floor, panicked, and put it into her black

2  purse. *Id*. Officer Hager then opened the black purse, removed a jacket from the

3  purse, and saw a chrome semi-automatic handgun. *Id*. It was at this point that Ms.

4  Favro's story changed dramatically. *Hager Report* — p. 3.

5

### Ms. Favro's Second Story

6         While at the hospital, Ms. Favro changed her story and stated that she and

7  Mr. Cardenas were at the casino in Moses Lake earlier that night but she had gone

8  home. *Id*. at 4. After Mr. Cardenas "scored big," he called her and persuaded her

9  to drive him to the Northern Quest Casino in Spokane. *Id*. After gambling

10  separately for some time, the two met back up in the parking lot; Mr. Cardenas

11  brought two women with him whom Ms. Favro failed to mention in her first

12  retelling of the night. *Id*.

         With Ms. Favro driving the other three, the two women directed her to

13  1825 W. 6th, the address where the shooting would later occur. *Id*. Once they

14  arrived, the two women got out and Mr. Cardenas went into the alley. *Id*. After a

15  few moments she heard shots. *Id*. She then dove into some bushes, saw a man run

16  past, and saw Mr. Cardenas run up saying he was shot. *Id*.

17

### Detective Kittilstved's Additional Report

18         Arriving on scene of the shooting at 8:20 A.M. Det. Sgt. Michael

19  Kittilstved was briefed that several complainants had called in "shots fired" and

20  one specific eyewitness observed a male standing in the doorway of the back

21  porch of 1825 W. 6th and shooting towards another male who was running away

22  from the residence. *Additional Report, Det. Kittilstved* — Page 1 (hereinafter

23  MOTION TO SUPPRESS STATEMENTS AND PHYSICAL
    EVIDENCE - 4

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

"*Kittilstved Report*") (APPENDIX-C). At this time, Det. Kittilstved was assigned
to complete a search warrant for the address of 1825 W. 6th and for the white
Chevy Malibu that Mr. Cardenas was transported in from the scene to the
hospital. *Id.* In compiling the details of the search warrant, Det. Kittilstved
utilized the additional reports of Ofc. Roberge, Ofc. Bode, Ofc. Hager, Det.
Blake, Sgt. Ervin, and Det. Presta. *Id.* At 11:15 A.M. Det. Kittilstved presented
the search warrant to Superior Court Judge Plese who subsequently signed it. *Id.*

### Ms. Favro's Third Story

At 8:49 AM, just after Det. Kittilstved arrived on the scene, and much
before he gained the signature of Judge Plese on the search warrant, Officer
Presta began to interview Ms. Alicia Favro at the police station. *Additional
Report, Det. Presta* — Page 1 (hereinafter "*Presta Report*") (APPENDIX-D). It
was during this interview that Det. Presta was informed by Ms. Favro that she had
two felony convictions on her record: one for First Degree Assault - a Class A
Felony; and the other for Forgery - Class C Felony and a crime of dishonesty. *Id.*
at 3-4. Ms. Favro's criminal convictions of Forgery and First Degree Assault was
omitted from the affidavit for the April 26, 2012 search warrant. *April 26, 2012
Search Warrant* (hereinafter "*4/26/2012 Search Warrant*") (APPENDIX—E).

For the third time, Ms. Favro altered the alleged events of the morning and
after her vehicle exited the highway. *Id.* at 2-3. In this retelling, instead of her and
Mr. Cardenas leaving the casino alone, as her first story alleged, or Mr. Cardenas
getting out to relieve himself when they arrived at the house of the two women, as
her second story alleged, Ms. Favro contended that when they arrived at the house
the two women asked if she and Mr. Cardenas would like to come inside. *Id.*

MOTION TO SUPPRESS STATEMENTS AND PHYSCIAL
EVIDENCE - 5

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

1  Continuing, she alleged that after declining the offer, she and Mr. Cardenas drove

2  for about a half block before he got out to urinate; for this rendition of her story,

3  that is when and where she heard the shots. *Id.*

4

5                              **Ms. Favro's Fourth Story**

6          At about 9:39 A.M., while taking a break from the interview at the police

   station, Det. Presta was informed by Sgt. Ervin that Ms. Favro was lying about

7  several of her statements. *Id.* at 3. When Det. Presta confronted Ms. Favro with

8  this information, she once again changed her story. *Id.* This time she claimed that

9  when they arrived at the house she pulled into the alley, and it was then that the

10 two women and Mr. Cardenas entered the house together. *Id.* Staying in the

   vehicle, she then drove out of the alley and parked on the street. *Id.*

11

12

13            **Detective Kittilstved's Affidavit for April 26, 2012 Search Warrant**

          Det. Kittilstved, in the search warrant he prepared for Judge Plese, detailed

14 Ms. Favro's report of the events:

15     [Ms. Favro] told [Det. Presta] that she met [Mr. Cardenas] about 10 years
       prior and they are both from Moses Lake, WA. She goes to the casino with
16     [Mr. Cardenas] often and was gambling with him last night. He won about
       $3000 and asked her to drive them to Northern Quest Casino in Spokane.
17     They arrived at the casino around 0200 hours. She gambled by herself and
       later got a call from Cardenas. He had two other females with him. The
18     females said they were concerned about their kids getting to school on time
       and asked for a ride into Spokane. Favro drove all of them (Cardenas and
19     the two females) into Spokane and to an address the females directed her
       to. Upon arrival, the females went inside and Cardenas told her he had to
20     use the bathroom and he went inside the residence described at 1825 W.
       6th. A short time later, she heard a pop and the Cardenas jumped back into
21     her car and said he had been shot and to drive away and call medics and the
22

23 MOTION TO SUPPRESS STATEMENTS AND PHYSICAL          The Crowley Law Firm, P.L.L.C.
   EVIDENCE - 6                                                    Grand Central Building
                                                              216 First Ave. S., Ste 204
                                                             Seattle, Washington 98104
                                                        Tel (206) 625-7500 ♦ Fax (206) 625-1223

police. She did so and when she saw the patrol officer (Hager) she flagged him down. She said she had put the gun in her purse after Cardenas had placed it in the back seat. The purse and pistol were secured as evidence.

(*4/26/2012 Search Warrant* — Page 2A)

Outside the information provided by Ms. Favro, and in informing the search warrant, Officers contacted a complainant, identified only as T.N. who witnessed the events of April 26, 2012. (*4/26/2012 Search Warrant* — Page 2A). T.N. told the Officers that she heard a "pop" that sounded like a gun shot. *Id.* Looking out the widow, she saw a white sedan parked in the grass off the alley behind the back door of 1825 W. 6th, and *a white male in a white shirt and a dark hat standing on the porch. Id.* (Emphasis added).

The man on the porch was holding what T.N. thought to be a gun "gangster style" (palm facing down). *Id.* She then heard two more "pops," saw a second unknown-race man wearing *dark clothes* running eastbound away from the house, and then heard one more "pop." *Id. (*Emphasis added). Next, T.N. saw the man in the white shirt on the porch put his hand to his stomach and bend over; he then entered the white sedan and left. *Id.* at 2B. Finally, T.N. told the officers that she saw two women, both with backpacks, run westbound through the alley and a grey Subaru peel out and drive away eastbound. *Id.*

On April 26, 2012, based on the information provided by Ms. Favro, at approximately 3:44 PM, Officer Ervin and Det. Presta, along with Chief Dave Hayworth, Operations Director Schott Himmelspech, Safety Officer Andy Mcleod, Decon Officer Jason Reser, Medic Officer Dary Williams, and two entry officers Russ Butters and Mike Ramos, of the Spokane Fire Department, executed an initial search warrant for the white Chevy Malibu. *Additional Report, Officer*

MOTION TO SUPPRESS STATEMENTS AND PHYSCIAL EVIDENCE - 7

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

*Ervin* - page 3 (hereinafter "*Ervin Report*") (APPENDIX - F).  After the fire department officers conducted an initial search of the vehicle, they informed Det. Presta, who notified Officer Ervin, that they found a safe in the trunk of the vehicle, which contained large amounts of U.S. Currency and what appeared to be methamphetamine. *Id* at 4. Officer Ervin then told Det. Presta that the search warrant would have to be amended to seize the items. *Id*.

Police also examined the person of Arthur Cardenas and secured a statement from him.  He acknowledged to Norteno membership and tattoos on his body confirmed that statement.

## I.   MOTIONS IN LIMINE:

### A. Mr. Cardenas's Tattoos:

The United States apparently seeks to introduce evidence of Mr. Cardenas's tattoos a gang related evidence. Mr. Cardenas objects and seeks to exclude this irrelevant and inflammatory evidence.

This evidence pertaining to Mr. Cardenas's tattoos should be excluded because (1) there is no relevant nexus between the tattoos and the charged crimes, and (2) the probative value does not outweigh the prejudicial effect.  Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action. FRE 401. The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. FRE 403.

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

1    The gang related evidence of Mr. Cardenas's tattoos has no relevant nexus

2 between a gang and the crimes charges should therefore be suppressed. First,

3 courts have recognized that gang membership only has probative value under

4 appropriate circumstances. U.S. v. Thomas, 86 F.3d 647, 652 (7th Cir. 1996).

5 "Gang affiliation is particularly relevant, and has been held admissible, in cases
where the interrelationship between people is a central issue." Id. See United

6 States v. McKinney, 954 F.2d 471, 479 (7th Cir.), cert. denied, 506 U.S. 1023,

7 113 S.Ct. 662, 121 L.Ed.2d 587 (1992) (allowing evidence of how gang

8 controlled and disciplined members to show complete context of murder and

9 conspiracy); United States v. Lewis, 910 F.2d 1367, 1372 (7th Cir. 1990)

10 (allowing evidence of gang membership to establish joint venture and thereby
constructive ownership of firearms). However, See In the present case, the

11 charged crimes include Felon in Possession of a Firearm (Count 1), Felon in

12 Possession of an Explosive Device (Count 2), Possession of an Unregistered

13 Firearm (Count 3), Possession with Intent to Distribute 50 Grams or more of

14 Actual Methamphetamine (Count 4), Possession of a Firearm in Furtherance of a

15 Drug Trafficking Crime (Count 5).

16    At no time does the Government create a relevant nexus between the

17 charged crime and a claim of gang related activity. Traditionally, courts have only

18 deemed gang related evidence as admissible when the interrelationship between
people is a central issue. The events in the current case do not suggests that Mr.

19 Cardenas's alleged conduct was a result of some gang affiliation. The relevance

20 of Mr. Cardenas's tattoos are not such that they tend to make the charged crimes

21 more or less probable, and certainly gang affiliation is not a fact of consequence

22 in this case. The Government has not alleged that the charged crimes are in

23 MOTION TO SUPPRESS STATEMENTS AND PHYSICAL
EVIDENCE - 9

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

conjunction with a greater gang conspiracy or joint venture and the evidence before the court does not support such an assertion. Mr. Cardenas's tattoos are not relevant in the case at bar.

Assuming arguendo that Mr. Cardenas's tattoos are relevant, the probative value of the evidence does not outweigh its prejudicial effect and should therefore be suppressed. Courts have also noted that evidence of gang affiliation can oftentimes be unfairly prejudicial, and it is therefore required that district courts carefully consider the admissibility of such evidence. Thomas, 86 F.3d at 652. Furthermore, the substantial risk of unfair prejudice attached to gang affiliation evidence, noting such evidence "is likely to be damaging to a defendant in the eyes of the jury" and that gangs suffer from "poor public relations." U.S. v. Irvin, 87 F.3d 860, 864 (7th Cir. 1996)(quoting Lewis, 910 F.2d at 1372).

In Irvin, the Government's theory was that the gang evidence connecting the defendant to a motorcycle gang was relevant in establishing a "joint venture" where the defendants and the gang sought to deliver drug to achieve a "common purpose and common goal." Id. The Government argued that due to common membership in the motorcycle gang, it was more likely than not the defendants were in constructive possession of the drugs and that they both intended to distribute the drugs. Id. The court held that, "[i]t may be true that common membership in any group, whether it be a gang or a church group, makes it more likely that two people are involved in a given activity together, illegal or not. The inference is certainly weak, however, if the group itself is not somehow connected to the activity at issue. In other words, the fact that Irvin and Pastor are members of a motorcycle club is not especially probative of whether they jointly

MOTION TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE - 10

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

ventured to distribute drugs, unless the motorcycle club is shown to be involved with drugs." Id.

In the present case, as was found in Irvin, the same critical nexus between the charged crime and the alleged gang affiliation is missing. The Government has failed to provide evidence that the Nortenos have a direct link to the criminal activity alleged in this case. It would be highly prejudicial to admit evidence of Mr. Cardenas's tattoos because there is no logical connection that can be draw between the alleged conduct and is association, or lack thereof, with a gang. To allow such evidence would improperly taint the juror's minds and undoubtedly damage the defendant in the eyes of the jury.

**B. Statements of Ms. Favro:**

The prosecution has advised counsel that Ms. Alicia Favro has not been served with a subpoena and that, at the present time, she is unavailable as a witness. As such, the defense requests that all of her statements be excluded from the jury including any reference to those statements during its opening.

"In all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him…." U.S. Const. Art. VI.    The Confrontation Clause provides two types of protections for a criminal defendant are as follows: (1) the right physically to face those who testify against him, and (2) the right to conduct cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). The Confrontation Clause of the Sixth Amendment applies to witnesses who bear testimony against the accused. *Crawford v. Washington*, 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). A formal statement to government officers is testimonial in a manner that

MOTION TO SUPPRESS STATEMENTS AND PHYSCIAL EVIDENCE - 11

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

a casual remark is not. *Id*. Various formulations of "testimonial" statements exist including, "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id*. at 52.

"Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." *Id*. Testimonial statements of witnesses are only admitted where the declarant is unavailable, *and* where the defendant has had prior opportunity to cross-examine. *Id*. at 59. "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id*. at 68. "Hearsay" means a statement that the declarant does not make while testifying at the current trial or hearing, and a party offers in evidence to prove the truth of the matter asserted in the statement. FRE 801. Hearsay is not admissible unless otherwise provided. FRE 802.

Given that Ms. Favro's statements to police were testimonial hearsay, they should be excluded. In *Crawford*, petitioner stabbed a man who allegedly tried to rape his wife. *Id*. at 38. At trial, the State introduced petitioner's wife's tape-recorded statement describing the stabbing. *Id*. Petitioner had no opportunity for cross-examination. *Id*. The Supreme Court of the United State of America ultimately held that where testimonial evidence is at issue, the Sixth Amendment Confrontation clause demands that if a declarant is unavailable there must be a prior opportunity for cross-examination. *Id*. at 68. The Court further held, that testimonial statements, at a minimum, are those given in a police interrogation. *Id*.

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

In the present case, Ms. Favro's statements were taken by police officers in the course of investigation. Such statements would cause an objective individual to believe that they would be available for use at a later trial. Ms. Favro's statements are hearsay because they are out of court statements, sought to be introduced in court, for the truth of the matter asserted. Given the circumstances under which Ms. Favro offered her various versions of the events at issue, this Court should properly hold the statements to be testimonial.

The admission of testimonial statements must only be allowed if the declarant is unavailable *and* there was a prior opportunity to cross-examine the declarant's statements. Here, it is undisputed that Ms. Favro is unavailable to testify at trial. It is also undisputed that Mr. Cardenas did not have a prior opportunity to cross-examine Ms. Favro. Plainly, the State has failed to provide evidence that Ms. Favro's statements fall into an exception to the rule against hearsay, and the Government has failed to provide evidence that Mr. Cardenas had a prior opportunity to cross-examine Ms. Favro. As a matter of constitutional right, via the Confrontation Clause, and Supreme Court interpretation in *Crawford*, this Court should suppress any and all evidence pertaining to statements made to police by Ms. Favro.

MOTION TO SUPPRESS STATEMENTS AND PHYSCIAL EVIDENCE - 13

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ◆ Fax (206) 625-1223

1. **Evidence of statements made by Ms. Favro during the debriefing of Ms. Favro by Steven Garvin, State Prosecutor, in the presence of Jeff Compton, Ms. Favro's attorney, should be excluded as hearsay under 801 and 802 and is a violation of RPC 1.6 confidentiality of information.**

A formal statement to government officers is testimonial in a manner that a casual remark is not. *Crawford*, 541 U.S. at 51. Various formulations of "testimonial" statements exist including, "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id*. at 52. "Hearsay" means a statement that the declarant does not make while testifying at the current trial or hearing, and a party offers in evidence to prove the truth of the matter asserted in the statement. FRE 801. Hearsay is not admissible unless otherwise provided. FRE 802. A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted. RPC 1.6.

First, under a similar analysis as previously made in the first argument above, any and all statements made by Ms. Favro during her debriefing with the State Prosecutor, Steven Garvin, is to be considered inadmissible hearsay because it is testimonial in nature. Given that Ms. Favro is unavailable to testify, Mr. Cardenas lacks the ability to properly cross-examine her statements. The statements that were made would certainly cause a reasonably objective person to believe that the statement would be available for use at a later trial, as such, those statements should be suppressed.

MOTION TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE - 14

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ✦ Fax (206) 625-1223

Second, using the statements Ms. Favro may have made to her lawyer, Jeff Compton, would be in violation of the Rules of Professional Conduct as there is no evidence that Ms. Favro has waived the attorney/client privilege.

## I.   CONCLUSION

For the aforementioned reasons, all of Ms. Favros statements to police addressing her recollection of the events at issue should be excluded as inadmissible testimonial hearsay made by an unavailable witness. Furthermore, the statements should be excluded because Mr. Cardenas did not have a prior opportunity to cross-examine Ms. Favro's statements, to provide an indicia of reliability, given her multiplicity of versions of the events at issue. Las, any and all evidence of gang affiliation should also be excluded.  For the reasons herein, Mr. Cardenas prays for the relief requested above.

DATED this 4th day April, 2015.


/S/ John R. Crowley
John R. Crowley, WSBA# 19868
Lawyer for Mr. Cardenas
The Crowley Law Firm, PLLC

MOTION TO SUPPRESS STATEMENTS AND PHYSICAL
EVIDENCE - 15

## NOTICE OF ELECTRONIC SERVICE

I hereby certify that on April 9, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:  Clerk of the United States District Court and Assistant United States Attorney, Eastern District of Washington. On this same date, a copy of the attached document was mailed to the defendant in the above-captioned cause at.


  /s/ Jason Morgensen
Jason Morgensen, Paralegal
The Crowley Law Firm, PLLC
216 First Avenue S., Ste 204
Seattle, Washington 98104
206.625.7500 (L)
206.625.1223 (F)
Jason@JohnCrowleyLawyer.com

MOTION TO SUPPRESS STATEMENTS AND PHYSCIAL
EVIDENCE - 16

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

1

# APPENDIX—A

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

MOTION TO SUPPRESS STATEMENTS AND PHYSICAL
EVIDENCE - 17

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

# INCIDENT REPORT
## Spokane Police/Spokane County Sheriff

Page 1

| AGENCY NAME/SUBSTATION | EVIDENCE NUMBER | INCIDENT NUMBER |
|---|---|---|
| SPD | | 12-125771 |

| INCIDENT TYPE | INCIDENT CLASSIFICATION #1 | ATTEMPTED | INCIDENT CLASSIFICATION #2 | ATTEMPTED |
|---|---|---|---|---|
| Drug Involved, Gang, Gun Involved | ASSAULT-SUB BDLY HARM | ☐ | WPN-UNLAW POSS | ☐ |
| | INCIDENT CLASSIFICATION #3 | ATTEMPTED | INCIDENT CLASSIFICATION #4 | ATTEMPTED |
| | | ☐ | | ☐ |

| RESPONDING TO (Officer Assault) | | ASSIGNMENT (Officer Assault) |
|---|---|---|

| REPORTED ON | DATE/TIME | OCCURRED ON | DATE/TIME | OCCURRED TO | DATE/TIME | DISTRICT |
|---|---|---|---|---|---|---|
| Thu 04/26/2012 | 06:40 | Thu 04/26/2012 | 02:00 | Thu 04/26/2012 | 07:00 | |

| DISPATCH TIME | ARRIVED TIME | CLEARED TIME | REPORT DATE | REPORT TIME | LOST/STOLEN PROPERTY LOSS |
|---|---|---|---|---|---|
| | | | 04/26/2012 | 11:03 | |

| PRIMARY CHARGE | UCR/NIBRS CODE |
|---|---|

| LOCATION OF INCIDENT | LOCATION NAME (IF APPLICABLE) |
|---|---|
| 1825 W 6th, Spokane, WA 99204 | |

**SOLVABILITY FACTORS**
*Useful Physical Evidence, Witness to Crime*

| RELATED INCIDENT NUMBERS | INCIDENT XREF |
|---|---|

**ADDITIONAL REPORTING OFFICERS**
J Graves / T Cordis

## SUSPECTS

| CODE | NAME, LAST, FIRST, MIDDLE | SEX | RACE/ETHNICITY | DATE OF BIRTH/AGE |
|---|---|---|---|---|
| S-1 | **Cardenas, Arthur F** | M | W-White/Hispanic | ▓▓▓ |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES | DESCRIPTORS |
|---|---|---|---|---|---|
| 6'00" | 205 | Medium | Black | Brown | |

| CONFIDENTIALITY ☐ | ADDRESS, STREET, CITY, STATE, ZIP ▓▓▓ | RESIDENTIAL STATUS | PHONE |
|---|---|---|---|

| PLACE OF EMPLOYMENT/SCHOOL ADDRESS | OCCUPATION | EMPLOYER PHONE |
|---|---|---|

| DRIVER'S LICENSE | ☐ FAKE | STATE | SOCIAL SECURITY NO. | ☐ FAKE | OTHER ID |
|---|---|---|---|---|---|

| CODE | NAME, LAST, FIRST, MIDDLE |
|---|---|
| W-1 | **Favro, Alicia M** |

| ID NO./NAME OF REPORTING OFFICER | DISTRIBUTION |
|---|---|
| #287 - Hager, William | |

| APPROVAL | DATE/TIME |
|---|---|
| #147 - Nemec, Sean | 04/26/2012    15:30 |

Incident Report #1

04/20/2012 15:44:18.133

0001

U.S. v. Cardenas

# INCIDENT REPORT CONTINUED
## Spokane Police/Spokane County Sheriff

Page 2

| INCIDENT CLASSIFICATION | | | | ATTEMPTED | INCIDENT NUMBER |
|---|---|---|---|---|---|
| ASSAULT-SUB BDLY HARM | | | | ☐ | 12-125771 |

**VEHICLES**

| CODE | CIRCUMSTANCES | | LICENSE NO | STATE | LIC YEAR | LICENSE TYPE | VIN/HIN |
|---|---|---|---|---|---|---|---|
| V-1 | Seized | | AHD7408 | WA | | Regular | 1G1ZT51F16F121875 |

| YEAR | MAKE | MODEL | BODY STYLE | TOP/FRONT/ONLY COLOR | BOTTOM/REAR COLOR |
|---|---|---|---|---|---|
| 2006 | Chevrolet | Malibu (inc chevelle | Sedan, 4 Door | White | White |

| SPECIAL FEATURES/DESCRIPTION |
|---|
| Tinted Windows |

| DECAL NUMBER | REGISTERED OWNER | | HOME PHONE |
|---|---|---|---|

| VEHICLE DISPOSITION ☐ LEFT AT SCENE ☐ DRIVEN AWAY ☐ TOWED | REGISTERED OWNER'S ADDRESS: STREET, CITY STATE ZIP | | | | | VALUES |
|---|---|---|---|---|---|---|
| LOCKED ☐ Yes ☐ No | KEYS IN VEHICLE ☐ Yes ☐ No | DELINQUENT PAYMENT ☐ Yes ☐ No | VICTIM CONSENT ☐ Yes ☐ No | DRIVABLE | ESTIMATED DAMAGE | DAMAGE ☐ Window ☐ Top ☐ Home ☐ Inside | SHADE IN DAMAGED AREA |

| TOW COMPANY | | HOLD REQUESTED BY | HOLD FOR | | |
|---|---|---|---|---|---|

| RELEASED BY | DATE | TIME | RELEASE NO | RELEASING AUTHORITY | OWNER NOTIFIED | DATE | TIME | OPERATOR'S NAME |
|---|---|---|---|---|---|---|---|---|

**NARRATIVE**

This officer was going to a call up on 1400 W 13th to check on a vacant house where the caller said they thought someone was inside  As I was driving up there, another call came out close by of people reporting hearing gun shots in the area of 6th and Elm.  Just as I was pulling up to the address on W 13th, a white Chevy Malibu (AHD7408) pulls up in front of my patrol car. At first glance I thought it might have been a supervisor stopping to back me up on this call I was on.  The windows were tinted so I could not see inside.

The drivers door opens and this female dressed in bright orange exits.  She is waving her arms at me.  She tells me her friend in the back seat has been shot.  She tells me I need to get him to the hospital.  I put out that I was with a shooting victim.  I open the back door to check on him.  He was screaming from being in pain.  He told me he was shot in the stomach.  He was telling me to get him to the hospital.  I had radio call for medics.  The male identified himself as Art Cardenas.  He gave me his DOB of 11-26-78.

Sgt T Meyer arrives and I told him the victim is in the back seat of the white car  He talked with him as I pulled the frantic female away from the vehicle to get her info and try to figure out what had happened  I asked for her ID.  She reached inside the vehicle and got a wallet out of a black purse that was on the front passenger seat.  She pulled out her ID and gave it to me(Alicia M Favro 7-5-70).

I asked A Favro what happened.  She first told me they were at the Casino in Moses Lake. Art won big and wanted to go to Northern Quest Casino and gamble there.  Not being familiar with Spokane, Art told her to take this exit.  She wanted to go to the store  When they got off the freeway he told her he needed to pee.  She stopped the car and he went into an alley.  She could not tell me where exactly she parked at.  She said 2 minutes went by and she heard gun shots.  Art ran up to her and told her he was shot.  He got in the car and she tried finding a hospital.  They saw me and flagged me over.

A Favro was concerned about Art and wanted to go to the hospital.  She wanted to drive the car she was in but I told her that would not be possible.  She did not understand.  I told her there is

CONTINUED ON NEXT PAGE
04/2/2012  5:44  46

0002
U.S. v. Cardenas

# INCIDENT REPORT CONTINUED
**Spokane Police/Spokane County Sheriff**

Page 3

| INCIDENT CLASSIFICATION | ATTEMPTED | INCIDENT NUMBER |
|---|---|---|
| ASSAULT-SUB BDLY HARM | ☐ | 12-125771 |

evidence the detectives want to get a look at it before they release the car back to her. She asked me if she could ride in the ambulance. The ambulance personnel said no. I told her I would drive her to the hospital. She got her purse out of the front passenger seat and another pink canvas bag. I told the supervisor I was going to the hospital with A Favro and I was going to contact Ofc Graves and find out the status of Art. I sat A Favro in the back seat of my patrol car. She was on the phone trying to get ahold of a relative to Art. I told her to wait till we get to the hospital so she could give family members Art's current status. I drove her to Sacred Heart. She kept on telling me over and over she could not believed what had happened to her.

As I pulled into the hospital parking lot, radio asked me if I was clear for traffic. They told me that Art, my victim, could be the suspect. They were going to have the vehicle he was in impounded. A Favro was curious and kept asking me what was going on. She seemed very nervous. I had her get out of my vehicle. I told her we were getting some more information and it would help if she had any idea of what the suspect looked like. She told me she did not see any body. She just saw Art running to the car saying he was shot. She said she was scared anyways when she heard the shots. She told me she dove near some bushes to hide. She said she never saw the suspect but he ran by her. I interrupted her and acknowledge the fact she just now told me she saw the suspect. She said she thought she was going to die and did not want to look at him. She saw a male wearing a dark cap then Art came running up telling her he was shot.

It was obvious to me that A Favro was not being forth coming with information that would help us find out what actually took place. The lack of eye contact and her nervousness as I asked her about what she knew, kind of told me she was worried more about herself and not Art. I did not want her to think that I might not believe her. I spoke to her about Art's well being and she needed to focus on that. She asked to go to the bathroom. I allowed her to go. She was not in there long and I could hear here urinating. She came out and thanked me. She still had both purses with her.

We walked down to the ER room. I was bothered that now I have information that Art could be the suspect and I was bothered about what involvement A Favro might have had in all this. I wanted to make sure there were no weapons in her bags. Because of the construction at the hospital there was no ck point for weapons. I told her that before she could sit in the ER, that I needed to check her purse for weapons. Her eyes got big and she immediately asked me why. I told her again because of the hospital rules. I also had my own safety concerns after the new information I had received. She was shaking her head no and holding onto both purses tight. Red flags were going off in my head telling me there was a weapon in her purse. She told me she did not want me to look in there because of some personal items in there. I asked her what those were. She said it was personal. I took the purses from her and I told her I believe she is hiding a weapon in one of the purses. She started stuttering and began breathing heavy. She told me we needed to go somewhere in private. She kept saying that over and over again. Need to go somewhere private.

I found an empty hallway. She told me when she got out of the car after Art was shot, she saw a gun on the floorboard. She panicked and put it in her purse. I asked her which one. She said the black one. I opened up the black purse. There was a black jacket stuffed in the top of it. I removed that jacket and saw a chrome semi auto handgun with the hammer locked in the back position. I kept the gun in the purse. I told her to tell me exactly what happened. She said she and

## INCIDENT REPORT CONTINUED
*Spokane Police/Spokane County Sheriff*

Page 4

| INCIDENT CLASSIFICATION | ATTEMPTED | INCIDENT NUMBER |
|---|---|---|
| ASSAULT-SUB BDLY HARM | ☐ | 12-125771 |

Art were at the casino in Moses Lake. Art apparently scored big and had a few thousand dollars. She had gone home but Art called her and wanted her to take him to Spokane to the Northern Quest Casino and gamble some more. Art offered to give her some money for the ride. They made it to the Casino. Meanwhile Art met up with two girls. A Favro did not know this until he called her and told her to meet him in the parking lot. Art had two females with him. They all got into the car and A Favro drove them to where the shooting occurred. She said the females directed her to the house. They got out and Art went into the alley. A little bit later A Favro heard the shots and dove into some bushes. One guy ran past her and Art came up saying he was shot. Art got into A Favro's vehicle and told her to get in. She got into the front passenger. Art started driving. He kept saying he was shot and he was going to die. She told him to stop the car and she would take him to the hospital. He stopped the car. She helped him get into the back. As she did this she saw the gun on the floor. She picked it up and put it in her purse. She got in the drivers seat and started to drive. She did not know where she was going. Art kept screaming he was going to die. They saw me drive by in my patrol car. he was yelling at her to get the police. They saw me pull over and she pulled infont of me.

    I told her to wait in the ER and I would find out Art's status. I also wanted to alert Officer Graves of what I had. Our radios do not transmit inside the hospital so we had to use telephones for communication. I found Ofc. Graves in the OR Room. I spoke to Sgt D Ervin who is a supervisor for the gang task force. I told him what I had and I wanted to take A Favro to the station to one of the interview rooms. He agreed. I told Ofc Graves I was going to leave and take A Favro to the station.

    As I was walking back to the ER room. A Favro was being escorted by a hospital chaplain aid. We all walked back to the ER area. By this time some gang officers arrived and another SPD officer arrived to assist. A Favro was really nervous again and was asking me if she was in trouble. Once we were outside I told her that she could be looking at rendering criminal assistance charges and felon in possession of a firearm. I told her she was not free to leave and we were going to the police station and she was going to be interviewed by the detectives. She said she did not mean hiding things from us. She was just scared. A Favro was patted down for any other weapons. We were going to ask for a female officer and A Favro said there was no bother. She was not hiding anything and she said she was fine for the pat down.

    I transported her to the station. I allowed her to have a cigarette before we went in. We walked to the interview room. I did not ask her any questions relating to the firearm or not telling me the truth. I wanted to know more about the 2 females and where they might be. A Favro said the females should be right where the shots where. If we had the address we would find them there. She kept telling me they were only there for a couple of minutes and how could this happen. I told her the girls probably set them up for a robbery knowing Art had a lot of cash on him. She would not believe that

    Detective D Presta met me at the interview room. I informed him of what I did. He had me take the purses and place them on property.

    I drove to the property room. I had to make the handgun as safe as possible for handing without destroying evidence. I took the camera at the property room and took a photo of the purse

Incident Report #1

CONTINUED ON NEXT PAGE
04/28/20  [illegible]

0004
U.S. v. Cardenas

## INCIDENT REPORT CONTINUED
### *Spokane Police/Spokane County Sheriff*

Page 5

| INCIDENT CLASSIFICATION | ATTEMPTED | INCIDENT NUMBER |
|---|---|---|
| *ASSAULT-SUB BDLY HARM* | ☐ | **12-125771** |

and with the gun inside it. I took a close up on the firearm that show's the hammer in the back position. With the help of property I took a plastic zip tie and was able to keep the hammer in its current position while blocking the firing pin from any accidental discharge. The contents in both purses were left in place other than the firearm and placed in Locker #10 an #12 as evidence.

W Hager #287
Spokane Police Dept

Incident Report #1

END OF INCIDENT REPORT

1

**APPENDIX—B**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

MOTION TO SUPPRESS STATEMENTS AND PHYSCIAL
EVIDENCE - 18

The Crowley Law Firm, P.L.L.C.

Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

# SUPPLEMENTAL REPORT
### *Spokane Police/Spokane County Sheriff*

Page **1**

| AGENCY NAME/SUBSTATION | | EVIDENCE NUMBER | INCIDENT NUMBER | |
|---|---|---|---|---|
| *SPD* | | | **12-125771** | |

| REPORT PURPOSE | | REPORTED ON  DATE | TIME | INCIDENT XREF |
|---|---|---|---|---|
| | | *Thu*  04/26/2012 | 06:46 | |

| INCIDENT CLASSIFICATION #1 | ATTEMPTED ☐ | INCIDENT CLASSIFICATION #2 | ATTEMPTED ☐ |
|---|---|---|---|
| *ASSAULT-WEAPON* | | | |
| INCIDENT CLASSIFICATION #3 | ATTEMPTED ☐ | INCIDENT CLASSIFICATION #4 | ATTEMPTED ☐ |

| DISPATCH TIME | ARRIVED TIME | CLEARED TIME | REPORT DATE | REPORT TIME |
|---|---|---|---|---|
| | | | 04/26/2012 | 10:26 |

PRIMARY CHARGE                                                                    UCR/NIBRS CODE

## VICTIM/WITNESSES/OTHERS

| CODE | NAME: LAST, FIRST, MIDDLE | | | SEX | RACE/ETHNICITY | DATE OF BIRTH/AGE |
|---|---|---|---|---|---|---|
| *V-1* | **Cardenas, Arthur Frank** | | | M | W-White | ▮▮▮ |

| HEIGHT | WEIGHT | BUILD | HAIR | EYES | DESCRIPTORS |
|---|---|---|---|---|---|

| CONFIDENT-IALITY ☐ | ADDRESS: STREET CITY STATE ▮▮▮ | RESIDENTIAL STATUS | PHONE |
|---|---|---|---|
| PLACE OF EMPLOYMENT/SCHOOL/ADRESS | | OCCUPATION | EMPLOYER PHONE |

| CODE | NAME: LAST, FIRST, MIDDLE |
|---|---|
| *MIR-1* | **Keller, Jon** |

| CODE | NAME: LAST, FIRST, MIDDLE |
|---|---|
| *MIR-2* | **Kelly, Rick** |

| CODE | NAME: LAST, FIRST, MIDDLE |
|---|---|
| *OW-1* | **AMR** |

| ID NO./NAME OF REPORTING OFFICER | DISTRIBUTION |
|---|---|
| #279 - Graves, Jeffrey | |
| APPROVAL | DATE/TIME |
| #147 - Nemec, Sean | 04/26/2012    15:28 |

04/26/2012 15.43.42.227

Supplemental Report #1

## SUPPLEMENTAL REPORT CONTINUED
### Spokane Police/Spokane County Sheriff

Page **2**

| INCIDENT CLASSIFICATION | ATTEMPTED | INCIDENT NUMBER |
|---|---|---|
| **ASSAULT-WEAPON** | ☐ | **12-125771** |

ADDITIONAL PHONES
*(Business) (509) 328-8800*

NARRATIVE

On 04/26/12 at 0646 hours I responded to assist officer Hager at 13th and Cedar. He dispatched that he was contacting the victim of a shooting. I was only six blocks away.

When I arrived, Hager was speaking with a female seated behind the wheel of a white 4 door car. Sgt. Meyer was standing at the car's open left rear door speaking with a male. The male, identified as Arthur Cardenas, had been shot in the abdomen. Sgt. Meyer ordered me to get him a blanket to lay on.

I retrieved a wool blanket out of the trunk of Hager's patrol car and brought it to Cardenas. I leaned into the right rear passenger door and observed Cardenas sitting behind the driver's seat holding his abdomen. He was wearing a black T-shirt, and blue jean shorts. I layed the blanket across the back seat, however, Cardenas remained in a sitting position.

I asked Cardenas to tell me his name and date of birth. He provided me the information and spelled his last name. When I asked who'd shot him, he began moaning. When I asked where the shooting occurred he didn't answer. When asked who had been with him, he didn't answer.

AMR and SFD station #4 arrived onscene. Cardenas was loaded into the ambulance and transported to SHMC. I followed the Ambulance in my patrol car. AMR (ambulance) EMT Jon Keller and medic Rick Kelly treated Cardenas enroute to the hospital. I met the ambulance at the hospital and followed Cardenas as he was taken from the ambulance into the ER trauma room.

As he was being treated I observed two separate holes (bullet wounds) to Cardenas' abdomen. One to his right side below the ribs and one to the left below the ribs. His clothing and personal items were removed from him and left in the trauma room as he was transferred to the operating room. I gathered the items, his clothing with wallet and cash, cell phone, and shoes and put them into a bag as evidence. I then waited outside the operating room.

I placed several calls to police dispatch providing status updates.

At approx. 0820 hours I was relieved by detectives Presta and officer Roberge. Cardenas was still in the operating room.

I cleared the hospital and responded to police property. I booked Cardenas' clothing and personal items, including a cell phone, onto property. His black wallet containing his Washington ID and other paperwork was removed out of the back pocket of his jean shorts. I discovered 39 one hundred dollar bills wrapped in a rubber band in his front pant pocket and $1.28 in change. The items were booked into individual packaging. (See property sheet).

CONTINUED ON NEXT PAGE
04/28/2012 15:43:42.477

0013
U.S. v. Cardenas

## SUPPLEMENTAL REPORT CONTINUED
*Spokane Police/Spokane County Sheriff*

| INCIDENT CLASSIFICATION | ATTEMPTED | INCIDENT NUMBER | Page 3 |
|---|---|---|---|
| *ASSAULT-WEAPON* | ☐ | *12-125771* | |

See officer Hager's face sheet report.

J. Graves #279

END OF ADDITIONAL REPORT
04/26/2012 15:48:42.508

0014
U.S. v. Cardenas

# APPENDIX—C

MOTION TO SUPPRESS STATEMENTS AND PHYSCIAL
EVIDENCE - 19

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

Page: 1 of 2
Report #: **12-125771**
Detective: **PRESTA**

Spokane County Sheriff's Office
Additional Report

Date: 4/27/12

Incident Classification: 1ST ASSAULT/UNLAWFUL POSSESSION OF A FIREARM

Location: 1825 W. 6TH

Complainant/Victim:        Race:     Sex:     DOB:

Suspect: .    Race:    Sex:     DOB:

X-Reference #'s:

Department Status: Further Investigation

NIBRS Status: Not Applicable

Detective SGT. KITTILSTVED #5995

On 4/26/12 at about 0745 hours, I was requested by Sgt. Ervin to respond to the area of 1800 W. 6th in regards to a shooting with a victim incident. SPD patrol has responded to a shooting call and located a male victim (Arthur CARDENAS) near the scene as he was being driven away. He was in stable but serious condition at Sacred Heart ER. Det. Presta and Ofc. Roberge went to the hospital.

I arrived onscene around 0820 hours. I was briefed by SPD Patrol officers along with Sgt. Ervin. The information given to us was that several complainants called in shots fired and one specific eyewitness observed part of the shooting as a male matching CARDENAS description was standing in the doorway of the back porch at 1825 W. 6th and shooting towards another male who was running away from the residence.

Det. Presta was assigned as the lead investigator. It was determined that I would complete a search warrant for the address of 1825 W. 6th and for the vehicle that CARDENAS had been transported from the scene in, which was currently impounded to the SPD Property facility.

I went to the SVCGET office with Officer Bode, who contacted the primary eyewitness. She was referred to by her initials in my search warrant affidavit based on the fact that this crime may have been gang related due to CARDENAS known gang affiliation (obtained from Grant County via Ofc. Roberge) and the witness' fear of retaliation. Officer Bode, Officer Hager, Det. Presta, Det. Blake and Sgt. Ervin provided information that assisted in writing the search warrant affidavit. See their additional reports.

I ran CARDENAS through NCIC and received a criminal history on my terminal. I included the conviction information (felonies) in my search warrant.

I contacted Superior Court Judge Plese in her chambers. She read the warrant and asked why I wanted to collect the clothing and jewelry. I explained that those items may contain DNA or identifying information regarding the owner(s) and that would assist investigators in solving this crime. She requested that I write in that and I did. She signed the search warrant at 1115 hours.

I advised unit's onscene that the search warrant was signed. I responded to the location and assisted in clearing the residence for safety purposes at 1136 hours (time of entry). No persons were found inside. The residence looked as if it was being unpacked from a recent move-in. My primary duties while in the residence were to complete the return of service paperwork, complete the property/evidence logs, and to collect evidence. I completed a handwritten log of items taken from the residence/property related to the search warrant parameters.

I noted on the log who found the item and where it was found, and in some cases (where applicable) the corresponding evidence letter used by Forensics Specialist Diamanti as she took photographs.

I did collect several items, to include bullet fragments, curtains, cigarette butt and a BB gun. Please refer to the property logs for further information on those items.

I also took down measurements of the residence, items of evidence and location of bullet strikes from Det. Presta and Special Agent Torres (US Border Patrol). I used these measurements and later completed a diagram/sketch of the scene.

I locked the rear door and left the scene with other investigators. I then assisted with placing the items onto Property by entering the items from the log sheet information into the BEAST computer system. Labels were printed and placed on the items by Ofc. Rose and Det. Presta.

Investigation continuing, end of report.

SGT. KITTILSTVED #59955 *MK*
SVCGET

# APPENDIX—D

MOTION TO SUPPRESS STATEMENTS AND PHYSCIAL EVIDENCE - 20

The Crowley Law Firm, P.L.L.C.
Grand Central Building
216 First Ave S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

Page: 1 of 9
Report #: **12-125771**
Detective: **Presta**

Spokane Police Department
Additional Report

Date: 5/2/12

Incident Classification:  First Degree Assault with a Firearm

Location:  1825 W. 6th Avenue

Complainant/Victim: City of Spokane  Race:    Sex:    DOB:

Suspect: Favro, Alicia M.  Race: W  Sex: F  DOB

X-Reference #'s:

Department Status: Further Investigation

NIBRS Status:  Not Applicable

Detective Presta

On 4/26/12, I was contacted by Sergeant Ervin about a shooting incident that occurred near 6th Avenue and Elm.  I was advised to respond to Sacred Heart Medical Center and contact Officer Roberge reference this incident.  Upon arrival, I contacted Officer Roberge, who advised a shooting victim identified as Arthur Cardenas was currently in the surgery facility. An additional female, Alicia Favro, was in the waiting room area.  I was advised Officer Graves was in the area near the surgery center while Officer Hager was with the female.  I was further advised that Officer Hager had located a firearm in Favro's purse.

I then contacted Officer Graves who had collected clothing and a cell phone from Cardenas at the hospital.  Officer Roberge relieved Officer Graves, who later placed the items he had collected on police property as evidence.

I then contacted Officer Hager, who advised he was transporting Favro to the Public Safety Building for a further interview.

I then responded to the Public Safety Building and contacted Officer Hager and Favro.  I brought Favro into an interview room.  At 0849 hours, I asked Favro if it was okay to record the interview, both audio and video.  Favro advised it was okay to record the interview.  At 0852 hours, I read Favro her constitutional rights from a preprinted rights card.  Favro advised she understood and agreed to waive her rights.  She then signed the rights card.

I asked her about her relationship with Cardenas.  She advised she met him approximately ten years ago in prison.  She advised over the past two years they have frequently seen each other, mostly at casinos, to include Papagayo's Casino in Moses Lake and Northern Quest Casino in Airway Heights.

Favro advised she was in Papagayo's Casino in Moses Lake on 4/26/12 around 0000 to 0100 hours. She advised that Cardenas had entered the casino and had given her some money for gambling. She advised she had been losing money and was appreciative that he gave her additional funds. Favro said an employee at Papgayo's had told her theat Cardenas had won a large amount of money.

Favro later left the casino and went to her residence. She advised that she sent Cardenas a text message stating "you saved me." Sometime after that, Cardenas called Favro's cell phone, but she did not answer it. At some unknown time after that, Cardenas showed up at her house and said he had money and wanted to go to the Northern Quest Casino in Airway Heights.

Favro said Cardenas was by himself and he had shown up in a white Malibu. He explained that the car was his "cousin's" vehicle. Favro said she drove the vehicle to Northern Quest due to the fact she has a driver's license and broad insurance. While en route to the casino, Cardenas had fallen asleep. Favro had called the hotel to obtain directions and to determine if a hotel room was available.

Favro advised once they arrived at the hotel, Cardenas immediately went inside while she gathered some of her belongings. She eventually went inside and began playing at the Spanish 21 table. She did not see Cardenas while she was inside the casino. A short while later Cardenas had called her and explained he wanted to give two females a ride to their house. She met up with Cardenas and the two females. Cardenas explained that the females needed a ride home due to the fact their babysitter was not reliable to wake their children up and get them to school on time. Favro was upset and did not want to leave the casino, but reluctantly drove to the females' residence.

Favro advised she had never seen the females before and could only identify them as white females; one skinny with stringy blonde hair and the other had brown hair. She advised she drove the white Malibu while Cardenas was in the front passenger seat. The two females were in the back seat. The females asked her for her name, she only identified herself as Solo. She later indicated this was her nickname and even has the tattoo "Solo" on the back of her neck. Favro was unfamiliar with the Spokane area, and the females were giving her directions to the residence. She did not know which road or exit she got off on; she only remembers that it was the second exit after getting onto either the freeway or the highway.

After exiting the roadway, they drove a short distance to a residence. She was unable to describe the residence or neighborhood, but advised they pulled up to the residence where both females exited the vehicle. They explained they had just recently moved in and the residence was a mess, but had invited them into the residence. Both Favro and Cardenas refused and Favro began to drive away. After approximately one half block, Cardenas explained he needed to use the restroom, so she stopped the vehicle. Cardenas exited the vehicle and walked away from the vehicle momentarily. Favro explained she was working on some scratch tickets and later heard some kind of noise, which caused her to exit the vehicle. She began to walk away from the vehicle when she heard what sounded like gunshots coming

from a very close location. She advised there was nothing to hide behind, but she jumped onto the ground anyway. She heard some unknown individual running away or past her location. She then heard Cardenas get into the Malibu and yell at her to get in as well. Cardenas attempted to drive away, but was unable to and explained that he had been shot. He requested that Favro drive him to a hospital or call the police. Favro advised she assisted Cardenas from the front driver's seat to the rear passenger seat.

At that time, she noticed a firearm on the rear floorboard of the vehicle. She did not know whose firearm it was. She picked it up and concealed it in her purse. She then began to drive in an attempt to locate a hospital. Cardenas continued to request to get to a hospital. She eventually saw a police officer and flagged that officer down in an attempt to get Cardenas help. She later responded to the hospital with that police officer and later advised the officer she had a firearm in her purse.

At 0939 hours, I ended the interview and allowed Favro to exit the facility so she could smoke a cigarette. During that time I contacted Sergeant Ervin by phone. He advised of additional information about the shooting. I advised Sergeant Ervin of Favro's statements. He advised that she was lying about several statements she had made to me. After Favro had finished her cigarette and I was done speaking with Sergeant Ervin, I brought Favro back into the interview room.

At 1026 hours, I restarted the interview with Favro to question her about additional facts I had since obtained. This second interview was recorded on a separate DVD. I asked about Arthur's phone number. She advised it was in her phone under the contact "Art." I advised her that I had received additional information about the incident and was aware she was lying about several statements she had previously provided to me. At that point, Favro changed her version of the incident, specifically at the point of the house. Favro attempted to speak more about incidents that happened at the casino than at the residence. I advised her I was not concerned about her actions at the casino, but was more concerned about the actions at the residence where the shooting had occurred. This is where Favro changed her story. She advised that the female in the backseat had directed her to drive down an alley, which she did. She then parked in a grassy area in front of what appeared to be a duplex. She advised the area seemed to be run down. She also advised that Cardenas had entered the residence with the two females. Favro advised she stayed in the vehicle and then drove the vehicle out of the alley and parked it on the street.

I had asked Favro about her purse. She advised it was a black purse made by the company "Guess." I asked about her felony convictions. She advised she is a convicted felon and was not supposed to be in custody of the firearm. She explained she thought about getting rid of the firearm at the hospital in a bathroom, but did not want any other individuals to accidentally come across it. At that point, she realized I was asking about a crime she was involved in and she became rather upset. She then requested to be booked into the Spokane County Jail, which I later did.

I then placed Favro under arrest for First Degree Unlawful Possession of a Firearm and handcuffed (DL) her. I then walked her over the Spokane County Jail and booked her on the above charge. I completed a WACIC/NCIC III background check on Favro and found that she was a convicted felon. One felony was for Forgery (Class C felony) and had a disposition date of 3/8/02. The second felony conviction was for First Degree Assault (Class A felony) with the disposition date of 9/28/94.

I then responded to 1825 W. 6th Avenue, the location where the shooting had occurred. Other officers from the Spokane Violent Crime Gang Enforcement Team were on scene and in the process of executing a search warrant at that residence. I was advised that various bullet evidence had been recovered, both inside and outside of the 6th Avenue residence.

During that time, I was contacted by a Noah McNutt, who advised he was a maintenance worker for the property owner. McNutt advised the property owner was Anne Millane. The renter was a Jordan Sanman. I advised Noah of the report number and provided him with my contact information. I later advised him when officers had cleared the residence and the damage that had been done upon entry into the residence. Noah advised he would respond to repair the damage.

Officers of the Spokane Violent Crimes Gang Enforcement Team had also obtained a search warrant for the vehicle that Favro and Cardenas had left the shooting scene in. I was then advised that one of the AMR employees who had assisted in treating Cardenas' injuries at the scene had come down with some unknown reaction. I was advised he had some kind of chemical burn to one of his arms. The AMR employee was seeking medical attention for his injury, and the hospital was made aware of this. I was advised hospital employees were checking on Cardenas for any connection or similar types of injuries.

It was determined that the cause of the injury may have come from either Cardenas or the vehicle. Members of the Spokane Fire Department Hazmat Unit responded to the police property facility to examine the vehicle and clothing that had been removed from Cardenas' person. Hazmat employees were conducting a safety check for any possible chemicals or substance that could have been the cause of the AMR employee's injury.

Hazmat employees went into the drying room area of the property facility and examined the clothing that had been removed from Cardenas' person. They cut a portion of the clothing and later placed it into a device to examine any chemicals on the clothing. They were unable to locate any toxic substance on the clothing. Hazmat employees then went to the vehicle storage area and examined the interior of the vehicle, as well as trunk area. After they had examined the trunk area, members of the hazmat team advised they found a suspicious Tupperware container that was clear with a blue top. Inside the container they saw several individually wrapped baggies that contained a white, crystal-like substance. I examined that package and it was consistent with packaging of methamphetamine. They advised there was also a blue cloth bag that contained a large amount of US currency. Hazmat employees advised they were unable to locate any toxic substance that could have caused the injury to the AMR employee. I advised the hazmat team to place items back in the approximate same

location where they had discovered them. The vehicle was then secured back into the storage facility for the search warrant to be executed at a later time.

On 4/27/12, I amended the search warrant for the vehicle, to include the suspected drug and currency evidence in the trunk.

At 1425 hours, Sergeant Ervin, Forensic Specialist Brownfield, and Forensic Special Shrum responded to the Spokane Police vehicle storage facility and executed the search warrant on the vehicle at 1425 hours. The vehicle was examined for fingerprints, as well as blood evidence. There was also a search for items relating to the shooting, including any possible drug activity.

After the trunk area had been examined for latent fingerprints, Sergeant Ervin and I began to search the trunk area. Sergeant Ervin had located the bag of US currency, as well as the Tupperware of suspected methamphetamine. Sergeant Ervin then collected those items. I collected the US currency from Sergeant Ervin and transported to the property collection area where employee Bell and I counted the currency with a money counting machine. The total amount of currency from that bag totaled $17,410. Evidence employee Bell and I then placed that currency on property as evidence.

I then re-contacted Sergeant Ervin, who had weighed the suspected methamphetamine substance and determined it was approximately ten ounces in total weight. I assisted Sergeant Ervin in removing the white, crystal substance from each bag and placed all substances into a single bag. The packaging material was later placed on as a separate item to be fingerprinted. Sergeant Ervin had field-tested a portion of the substance, which field-tested presumptive positive for amphetamine.

I found a purse that had numerous personal items inside of it. I examined the contents and found several items belonging to different individuals. There were identification cards, credit cards, insurance cards, and a prescription bottle that belonged to approximately ten different individuals. There was also a couple of cell phones, a quantity of keys, and numerous gift cards.

I continued to search the trunk area and found a black duffle bag. Inside that bag were some men's clothing, as well as a personal hygiene kit. It appeared as if the item was an overnight bag that included a change of clothes and items for shaving and cleansing. The clothing shirt item found was a XXL shirt. There were Size 10 men's boots and a pair of pants with the size of 38x30.

I then found an item that appeared to be a pillowcase. Inside that pillowcase was another extra large shirt, as well as a pair of pants that had Size 38 waist. I found a yellow sticky note that appeared to be written by a female and had the words "by Arthur" and a smiley face written on it. I also found a tan US military bag. I opened the bag and found a cubicle shaped item that had black tape wrapped around it. I continued to search that military bag and saw a grenade sticking out of the bag. At that point I immediately stopped the search and evacuated

Page: 6 of 9
Report #: **12-125771**
Detective: **Presta**

the area due to the fact I was unsure what kind of explosive device I was dealing with. I then contacted Sergeant Kittilstved of the Spokane Sheriff's Office Explosives Disposal Unit who then responded to examine the items.

Upon arrival, Sergeant Kittilstved took control of the scene and began examining the items I had found. I was later advised that two separate containers of an explosive powder, as well as an operational grenade, were found in that military bag. (See Sergeant Kittilsved's report for additional information on that specific item).

Once the explosives were removed, the vehicle was again secured and placed back on police property. The vehicle had not been completely searched or processed for evidence. We determined that the search would be concluded at another time.

At 1746 hours, I received a call from Jordan Sanman, who advised that McNutt had advised her that an incident had happened at her residence, and I was the contact person. Sanman advised she wanted to talk about what had happened, so I arranged with her to meet me at the Public Safety Building. I then contacted Special Agent Torres of the Spokane Violent Crimes Gang Enforcement Team to respond to the Public Safety Building as well in the interview.

I had advised Sanman of an area where she could park her vehicle by the Public Safety Building where it would not receive a ticket or get impounded. Sanman drove to the area, but parked in a different location and walked to the Public Safety Building. I then brought Sanman into the Public Safety Building interview room and asked her if I could record the interview in both audio and video, to which she advised that I could. At 1834 hours, I read Sanman her constitutional rights from a preprinted rights card. She advised she understood and agreed to waive her rights. She then signed the rights card.

I began asking Sanman about the incident. She advised that early in the morning her friend "Tami" had called her and wanted to meet a friend of hers. Sanman was unsure of Tami's true name, but thought it was Tami Butler. Sanman drove to Tami Butler's residence and spoke to her further. Tami advised that her friend from Moses Lake was going to meet her at the Northern Quest Casino. Sanman and Tami then drove to the Northern Quest Casino in a red truck. Sanman advised she had been borrowing the vehicle from a friend of hers known as Ian Harris. Sanman advised they drove to the casino and met up with this friend who was a white male (Cardenas). This male was with another female. Sanman advised she had never seen either individual before. Sanman advised that the other individuals were nervous about being at the casino and wanted to go to the Couer d'Alene casino. Sanman and Tami then got a ride with this male and female to go to the Couer d'Alene casino. Sanman advised she wanted to change her clothing and requested to stop by her residence on the way to the Couer d'Alene casino. Sanman then provided directions to her residence, and they parked behind her apartment. Sanman advised the female had identified herself as being "Solo." Once they arrived at her residence, all four individuals went inside while Sansan went upstairs to change her clothing. Sanman came down and was advised somebody was knocking on the back door. Sanman went to the back door, opened it, and saw unidentified male with a gun. This

male then forced his way into the residence and went into the living room area where he confronted the other male (Cardenas).

Sanman advised she heard a gunshot and then saw this male run back out of her residence through the back door. Shortly after that, she saw the male (Cardenas) with a firearm shooting at and chasing after the first unidentified male. This male (Cardenas) was holding his stomach as if he was in pain. During this time the female, who had identified herself as Solo, had run out of the residence as well.

Sanman advised that the male and female (Cardenas and Favro) she had met at the casino then drove off in their white Malibu and left her and Tami at the residence.

I asked Sanman how she knew the vehicle was a Malibu. She advised while they were driving from the casino to her residence the male had told her that he had just purchased the vehicle and described the year and model to her. I had asked Sanman why she had driven with this male and female since she had a vehicle at the casino. Sanman explained that Ian Harris just happened to be at the casino when they were meeting this male and female, so she gave him the keys to the truck at that time.

I then asked Sanman what happened after everyone had left. Sanman advised that she and Tami then walked out of the house. Ian Harris happened to be there. They then received a ride away from the location with Ian in his red truck. I advised Sanman that she was lying about how she left the residence, and she immediately changed her story. She advised that a friend had given her a ride to Angie's house where her children were being babysat. She advised Angie lives near Broadway and Woodward. I asked her numerous times who had given her a ride. She eventually identified Jessica Rudolph. I asked about contacting Jessica. She advised her phone was dead and her phone number is in her contact list. I asked Sanman if I could charge the phone so I could look in her contacts to get Jessica's phone number. She advised that I could. I then read a search consent waiver form to Sanman, allowing me permission to search the phone for Jessica's phone number.

I continued to question Sanman on numerous statements that did not appear to make any sense. Sanman became very nervous and asked if she could leave. I advised her that the incident was still under investigation and that she could leave. I then examined Sanman's phone and found a contact for Jessica ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Agent Torres assisted Sanman out of the Public Safety Building and later followed her to her vehicle. She got into a red truck ▓▓▓▓▓▓▓ and drove off by herself. I then called the phone number for Jessica ▓▓▓▓▓▓▓ I spoke to an individual who claimed to be Jessica's mother. I advised her of the incident I was investigating. I advised her I had been told an individual had claimed that Jessica Rudolph had picked this individual up from Dick's on 4/26/12 at approximately 0700 hours. This individual advised that Jessica does not have her own vehicle and must borrow her vehicle in order to drive anywhere. She further advised that Jessica was at her residence on 4/26/12 at the time in question. She further advised that Jessica had woken up that day around 1000 hours. This female did not know where Jessica was currently at that time and advised I could call back at a later time to see if she was back at home. This

individual confirmed that Jessica could not have provided Sanman a ride on that date and time.

At that time I was able to determine that Sanman was continuing to lie about her involvement in the incident. I determined that Sanman might be more of a defendant in this case rather than a witness. I then determined that I would have to complete a search warrant on her phone to determine the times when she had called Tami and attempt to identify who this Tami individual was.

Agent Torres had followed Sanman, who had driven to the area of I-90 and Argonne. Agent Torres then discontinued in the surveillance on Sanman. I later placed Sanman's phone on police property as evidence.

On 4/30/12, I responded back to the police property vehicle storage lot with forensic specialist Dewey. Forensic specialist Dewey then completed the search warrant by examining the interior of the vehicle for latent print and blood evidence. Specialist Dewey collected five samples of suspected blood fluid from the vehicle, which I later placed on property. I then returned the search warrants on both the residences at 1825 W. 6th and the 2006 Chevy Malibu (WA AHD7408).

I then responded to Sacred Heart Medical Center and contacted Cardenas in his hospital room. I advised Cardenas I was investigating the shooting incident and wanted to speak to him about what he had seen. Cardenas advised he came to Spokane and met two females at the Northern Quest Casino. He advised he had met one of them prior, but did not know either individual's names. He advised that he may have the contact information in his phone for the female he had seen before. I asked Cardenas when the last time he had called this female and he said he had not contacted her in quite some time.

I was aware this statement was a lie due to the fact Sanman had already informed me that her friend "Tami" was aware that a friend from Moses Lake was going to Northern Quest Casino the night of the shooting.

Cardenas advised he and Favro gave the females a ride to some unknown house. I asked him why he had given them a ride. He advised he did not know why and indicated that one of the females was attractive and he was hoping to have intercourse with that female. They directed them to an unknown house where he, Favro, and the two females went inside. Shortly after that point, they heard a knock on the door and individual with a gun came inside the house and shot him. The male then ran and Cardenas gave chase after him. Cardenas advised he went out onto the back porch where he believes he was shot again. Cardenas advised he then drove off in his vehicle and saw his friend, who he identified as being Solo, on the ground by a tree. He then picked her up in the vehicle and she eventually drove away. He advised she was driving in circles and eventually they saw a police officer who they flagged down for assistance. Cardenas advised he does not remember anything after that point.

I then asked about the vehicle, indicating the white Malibu. Cardenas advised he is in the process of purchasing it. Cardenas then made a comment that the vehicle had been "jacked." I was confused by this statement, so I asked him what he meant. Cardenas then further explained that the vehicle had been stolen and he had heard that it was in the Spokane area. He advised that he and Favro had obtained a ride from some unknown other individual to Spokane.

Cardenas was unable to expand on this. I then realized he was attempting to come up with some sort of excuse as to why there might be illegal items in the vehicle.

During the interview, a female came out of the bathroom in the hospital room. The female later identified herself as being Cardenas' mother (Dolores Cardenas). Dolores was reluctant to have her son, Arthur, speak to me.

I then determined to end my interview at that point in an attempt to be able to speak with Arthur Cardenas at a later time. Dolores asked about Arthur's cell phone and clothing. I advised that they were on police property and would be released as soon as possible. I advised various items were being held as evidence. I requested Arthur's address so I could contact him by mail when items were ready to be released. Arthur would not provide his address, but Dolores provided her address for me. She provided the 624 Nelson residence in Moses Lake. I asked for Dolores' date of birth, and she refused, indicating that I might be a bill collector. I then left the hospital room.

At this point, it appears that due to lack of cooperation from all individuals, I may only be able to obtain truthful information contained within cell phones. That information may be obtained from cell phones that have seized in this investigation as far as timelines, contact information, and identity of other individuals like Tami Butler.

Further Investigation

Detective Presta #446
Gang Enforcement Team
5/3/12
db

1

## APPENDIX—E

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    MOTION TO SUPPRESS STATEMENTS AND PHYSCIAL
EVIDENCE  - 21

The Crowley Law Firm, P.L.L.C.

Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington  98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF SPOKANE

| | | |
|---|---|---|
| STATE OF WASHINGTON | ) | |
| | ) | |
| Plaintiff, | ) | No. |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| Arthur CARDENAS ▬▬▬ | ) | SEARCH WARRANT |
| and | ) | |
| 1825 W. 6th | ) | |
| Spokane, WA | | |
| Defendant(s). | | |

TO ANY PEACE OFFICER OF THE STATE OF WASHINGTON:

WHEREAS, <u>Sgt. Michael Kittilstved</u> has this day signed an affidavit on oath before the undersigned, one of the Superior Court Judges in and for the County of Spokane, that he believes that a crime has been or is being committed, to wit:

1st Degree Assault

Unlawful Possession of a Firearm

and that evidence of said crime is located:

(X) PREMISES, located at or described as follows:

**1825 W. 6th Spokane, WA (a grey duplex with white trim, with the numbers "1825" clearly visible and silver in color adjacent to the right side of the front-north door).**

(X) VEHICLE located at or described as follows:

**White Chevy Malibu (WA license plate AHD7408, VIN #1G1ZT51F16F121875)**

Page 1

to seize: (List property to be named in search warrant)

Dominion and Control items (to include indication of occupancy, residency, and/or ownership of the premises described above including but not limited to utility and telephone bills, envelopes and keys)

Cellular telephones

Firearms

Ammunition

Items or accessories related to firearm possession

Photographs or receipts showing the possession and/or purchase of any firearms

Trace evidence including but not limited to hairs, fibers, fingernails and any other transferable materials that can assist in identification.

Bodily Fluids including but not limited to blood and saliva.

Any fingerprints and or articles that could have fingerprints on them.

Clothing and jewelry. *with possible blood or gunpowder residue - mk*

Weapons or other common articles that could have been used as weapons.

Any other evidence of assault that can be identified as such evidence at the time of seizing the evidence.

WHEREAS, the undersigned finds that there is probable cause to believe said facts contained in the affidavit to be true,

THEREFORE, in the name of the State of Washington, you are commanded with 10 days (not to exceed ten (10) days) to:

(X) enter onto the aforementioned premises and vehicle

with the necessary and proper assistance, and diligently search for and seize:

Dominion and Control items (to include indication of occupancy, residency, and/or ownership of the premises described above including but not limited to utility and telephone bills, envelopes and keys)

Page 2

Cellular telephones

Firearms

Ammunition

Items or accessories related to firearm possession

Photographs or receipts showing the possession and/or purchase of any firearms

Trace evidence including but not limited to hairs, fibers, fingernails and any other transferable materials that can assist in identification.

Bodily Fluids including but not limited to blood and saliva.

Any fingerprints and or articles that could have fingerprints on them.

Clothing and jewelry. *with possible blood or gunpowder residue - mc*

Weapons or other common articles that could have been used as weapons.

Any other evidence of assault that can be identified as such evidence at the time of seizing the evidence.

and make a return of said warrant promptly, no later than three (3) days from the execution of the Search Warrant to the undersigned Judge, showing all acts and things done thereunder, with a written inventory of any properties taken and the name of the person or persons in whose possession the same were found, if any, and if no person be found in the possession of said articles, the inventory shall so state.

The peace officer taking property under the warrant shall give to the person from whom or from whose premises the property is taken a copy of the warrant and receipt for the property taken. If no such person is present, the officer may post a copy of the Search Warrant and receipt.

The inventory shall be made in the presence of the person from whose possession or

0123
U.S. v. Cardenas

premises the property is taken, or in the presence of at least one (1) person other than the seizing

officer. This person may be another officer.

DATE __4/26/2012__ TIME __11<sup>15</sup>__

JUDGE, Spokane County Superior Court

**JUDGE ANNETTE S. PLESE**

0124
U.S. v. Cardenas

SUPERIOR COURT, STATE OF WASHINGTON, COUNTY OF SPOKANE

| | |
|---|---|
| STATE OF WASHINGTON | ) |
| Plaintiff, | ) |
| | ) No. |
| | ) |
| vs. | ) AFFIDAVIT FOR SEARCH WARRANT |
| | ) FOR EVIDENCE OF: |
| | ) |
| Arthur CARDENAS ▇▇▇▇ | ) |
| and | ) 1st Degree Assault |
| 1825 W. 6th | ) Unlawful Possession of a Firearm |
| Spokane, WA | ) |
| Defendant(s). | |

Sergeant Michael Kittilstved being first duly sworn on oath deposes and says:

(1) Background of affiant: Sergeant Michael J. Kittilstved is a sworn deputy sheriff for the County of Spokane and has been employed in that capacity since September 1995. Your affiant is a graduate of Gonzaga University with a Bachelor's of Arts in Criminal Justice. He has attended the Washington State Basic Law Enforcement Academy and has received training in all areas of law enforcement including, but not limited to, crimes against persons and property, controlled substance crimes, Federal crimes, and gang related crimes. From December 1995 to September 1998, he worked in the Uniformed Patrol Division on various shifts. From September 1998 to December 2001, he was assigned to the Traffic Unit, and was responsible for collision investigations and traffic law enforcement. While there, he received extensive training in collision reconstruction and was a certified Reconstructionist investigator. He has been a member of the Spokane Explosives Disposal Unit since 2001 with a break between 2003-2008. He has been certified as a Hazardous Device Technician from the FBI at the Redstone Arsenal in Huntsville, Alabama. Your affiant was then promoted to Sergeant in September 2003 and worked in Uniformed Patrol until September 2006. Since that time, he has supervised the Spokane Gang Enforcement Team and received training related to criminal gang investigation. He is a task force officer and commissioned through the Federal Bureau of Investigations to make arrests for Federal crimes. Your affiant has prepared and executed numerous search warrants, including the type of crime for which this search warrant is being sought.

(2) Crime being investigated:
    1st Degree Assault
    Unlawful Possession of Firearm

Page 1

Circumstances supporting probable cause:

On 4/26/12 at 0640 hours, SPD patrol responded to a shooting call in the area of 616 S. Oak. A complainant heard four to five gunshots, heard a female scream and saw a white sedan leaving toward Elm in the alley behind him.

Additional SPD officers identified the possible shooting location as being at 1823 W. 6th. Officer Kennedy observed what he thought were fresh bullet holes near this residence on the exterior. Based on the fact that a victim may have been inside and needed medical attention, a protective sweep was performed. No one was located. Officer Bode contacted a witness (T.N.) who directed them 1825 W. 6th and said that is where the shooting occurred. Patrol officers performed a protective sweep of that residence and no one was located inside. The location was locked down in anticipation of a search warrant.

SPD Patrol officers were enroute to the location when Officer Hager was flagged down by a female driving a white Chevy Malibu (WA license plate AHD7408, VIN #1G1ZT51F16F121875) at 1400 W. 13th. The female, identified as Alicia Favro, told officers that her passenger, Arthur CARDENAS (              ), had been shot. Medics were summoned to the location. CARDENAS was transported to Sacred Heart Hospital for medical treatment. Officer Hager transported Favro to the hospital. Upon arrival, while going through security, it was discovered that Favro had a firearm in her purse. The firearm was a Walther Interarms 9mm/.380 semi-automatic pistol (serial #S116047). The vehicle was seized as evidence and is currently residening in a secure location at SPD Property.

A second complainant, identified as T.N., heard a shot and saw a white vehicle drive away westbound. T.N. also saw a white male in a black beanie and jeans run away in an unknown direction. While SPD Officer Bode was interviewing T.N., who because of fear of retaliation will remain identified by initials, told the officer the following: T.N. was in the upstairs bedroom, which has a clear, elevated, unobstructed view from the south of the south side of the duplex located at 1823 and 1825 W. 6th. T.N. was watching television and heard a car door close. T.N. looked out and saw a red sports car parked in the grass off of the alley directly behind the back door to 1825 W. 6th. Two white males exited the vehicle. The passenger went to the back door and the driver went and looked in the back window adjacent to the back door. It appeared the passenger tried to contact the house and after no one answered, they entered their vehicle left the area. T.N. got a cup of coffee and returned to watch television.

About 20 minutes after the car had left, T.N. heard a single pop that "sounded different from fireworks." T.N. jumped up and looked out the window. T.N. observed a white sedan with dark tinted windows parked where the red sports car had been. T.N. saw a white male wearing a white shirt and a dark beanie or baseball hat turned backwards (no bill to the front) standing on the porch of 1825 W. 6th. The back door was open and the male was holding a gun in his right hand shooting "gangster style" and described to the officer by holding his/her arm outstretched with the palm down. T.N. heard two more pops, saw an unknown-race male wearing dark clothing running eastbound through the alley, then one more pop.

Page 2A

T.N. then observed the male on the porch put his hand near his abdomen and bend over. Still holding the gun, he entered the white sedan and left west through the alley in the vehicle. T.N. then grabbed her phone and called 911. When T.N. looked back out the window, T.N. observed two white females with ponytails, both carrying backpacks, run westbound through the alley. T.N. then observed a charcoal-colored Subaru peel out and drive away eastbound on 6th.

Det. Presta later interviewed Favro at the police station. She told him that she met CARDENAS about 10 years prior and they are both from Moses Lake, WA. She goes to the casino with him often and was gambling in Moses Lake with him last night. He won about $3000 and asked her to drive them to Northern Quest Casino in Spokane. They arrived at the casino around 0200 hours. She gambled by herself and later got a call from CARDENAS. He had two other females with him. The females said they were concerned about their kids getting to school on time and asked for a ride into Spokane. Favro drove all of them (CARDENAS and two females) into Spokane and to an address the females directed her to. Upon arrival, the females went inside and CARDENAS told her he had to use the bathroom and he went inside the residence described at 1825 W. 6th. A short time later, she heard a pop and then CARDENAS jumped back into her car and said he had been shot and to drive away and call medics and the police. She did so and when she saw the patrol officer (Hager) she flagged him down. She said she had put the gun in her purse after CARDENAS had placed it in the back seat. The purse and pistol were secured as evidence.

While walking through the alley south of the residence, investigators located a small caliber bullet hole in a cedar fence that runs along the south alley line. The hole was in line with someone standing on the porch of 1825 W. 6th if they were shooting southbound. There was a second impact point on the residence itself at 617 S. Elm.

Cardenas was shot with a small caliber firearm. Projectiles are lodged in his abdomen (bowels) and according to the Sacred Heart ER Trauma doctor the projectiles are not going to be removed and he suffered from numerous perforations of the bowels. He is expected to survive from his injuries.

A criminal history report indicates that CARDENAS is a multi-convicted felon for Assault, Theft, Drugs, Firearm Possession, Arson and Robbery and is thus prohibited from possessing firearms. The convictions and dates are:

1st Robbery    12/94
2nd Arson    6/97
3rd Assault    6/97
2nd Possession of Firearm  11/99
Crimes by Prisoner (Drugs)  6/02
2nd Possession Stolen Property  6/02
2nd Theft    6/02
3rd Assault    3/06
Bail Jumping  4/06
Riot    6/97

Page 2B

Based on your affiant's training and experience, your affiant knows that firearm owners often keep and store firearms parts and ammunition. Also, your affiant knows that most pistol ammunition is sold in quantities of either 25 or 50 rounds that are usually contained in a cardboard box marked with the manufacture's name and the caliber of ammunition. Your affiant also knows that there is no backround check for the purchase of ammunition.

Your affiant also knows, based on his training and experience, that individuals who possess firearms usually store or keep these items on their person, in their vehicles, or vehicles under their control and custody, or in their residence or residences under their control, or storage buildings and outbuildings under their control, or at places where they temporarily stay. Firearms are usually maintained on their person, in their residence, or in a vehicle to which the person has access so as to be readily accessible.

Your affiant knows from training and experience that; trace evidence such as hairs, fibers, and fingernails are often found at the scene of crimes, and can be compared by laboratory personnel and such evidence can assist in the identification of victims, suspects and potential witnesses; that bodily fluids such as blood and saliva are often found at the scene of serious assaults, and can be compared by laboratory personnel and assist in the identification of victims, suspects and potential witnesses; that clothing, jewelry and other articles that have been worn by the victim, suspects, or potential witnesses at the scene often contain trace evidence and bodily fluids; that fingerprints on articles can be compared by laboratory personnel and assist in the identification of victims, suspects and potential witnesses; that weapons or other articles that could have been used as weapons often are located at the locations of serious assaults.

Based on the information above, Your Affiant believes that probable cause exists that evidence of the crime of 1st Degree Assault and Unlawful Possession of a Firearm will be found in the vehicle and location listed below.

Page 2C

WHEREFORE, affiant requests that a Search Warrant issue for the purpose of searching

(X) PREMISES, located at or described as follows:

1825 W. 6th Spokane, WA (a grey duplex with white trim, with the numbers "1825" clearly visible and silver in color adjacent to the right side of the front-north door).

(X) VEHICLE located at or described as follows:

White Chevy Malibu (WA license plate AHD7408, VIN #1G1ZT51F16F121875)

to seize: (List property to be named in search warrant)

Dominion and Control items (to include indication of occupancy, residency, and/or ownership of the premises described above including but not limited to utility and telephone bills, envelopes and keys)

Cellular telephones

Firearms

Ammunition

Items or accessories related to firearm possession

Photographs or receipts showing the possession and/or purchase of any firearms

Trace evidence including but not limited to hairs, fibers, fingernails and any other transferable materials that can assist in identification.

Bodily Fluids including but not limited to blood and saliva.

Any fingerprints and or articles that could have fingerprints on them.

Clothing and jewelry. *with possible blood or gunpowder residue -mc*

Weapons or other common articles that could have been used as weapons.

Any other evidence of assault that can be identified as such evidence at the time of seizing the evidence.

Page 3

AFFIANT PEACE OFFICER

SUBSCRIBED AND SWORN TO (or affirmed) before me this ___26___ day of
_____April_____, 20 1 2 .

JUDGE, Spokane County Superior Court

JUDGE ANNETTE S. PLESE

Page 4

1

## APPENDIX—F

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    MOTION TO SUPPRESS STATEMENTS AND PHYSCIAL
EVIDENCE - 22

The Crowley Law Firm, P.L.L.C.

Grand Central Building
216 First Ave. S., Ste 204
Seattle, Washington 98104
Tel (206) 625-7500 ♦ Fax (206) 625-1223

# ADDITIONAL NARRATIVE REPORT

PAGE 1 OF 4

| AGENCY NAME | CROSS REFERENCE NUMBER(S) | INCIDENT NUMBER |
|---|---|---|
| Spokane Police Department | | 12-125771 |

INCIDENT CLASSIFICATION: 1st assault/shooting

LOCATION OF INCIDENT: 1825 W. 6th, Spokane Wa

| TYPE OF PREMISE | LOCATION NAME | # OF UNITS ENTERED | DIST |
|---|---|---|---|

| | REPORTED ON | | | | OCCURRED ON OR FROM | | | | OCCURRED TO | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MONTH | DAY | YEAR | TIME | DOW | MONTH | DAY | YEAR | TIME | DOW | MONTH | DAY | YEAR | TIME | DOW |
| 5 | 1 | 12 | | | 4 | 26 | 12 | | ... | | | |

CODES: C – COMPLAINANT, CV – COMPLAINANT IS VICTIM, G – PARENT/GUARDIAN, P – MENTIONED IN REPORT, RO – REGISTERED OWNER, V – DECEASED, V – VICTIM, VB – VICTIM BUSINESS, W – WITNESS
SUBJECT CODES: A – ARREST, I – INSTITUTIONAL, M – MISSING, R – RUNAWAY, S – SUBJECT/SUSPECT

| CODE | NAME: LAST, FIRST MIDDLE | RACE | SEX | DOB/AGE | RESIDENCE/WORK/CELL/MESSAGE PHONE |
|---|---|---|---|---|---|

On 4/26/12 at approximately 0715 hours I received a phone call from Sgt. T. Meyer. He advised there had been a shooting in the area of 6th and Elm. Officers were in the area looking for the specific crime scene. Officer Hager had been in the area of 13th and Cedar when he was flagged over by a female. The female told him that she had a shooting victim in the back of her car. Medics transported the victim to Sacred Heart Hospital and Officer Hager was transporting the female there. Sgt. Meyer advised he was with the car at 13th and Cedar. He further advised that Major Crimes had been called and they were not coming out at this time. I requested that he secure the vehicle as evidence. I further advised him I would be coming to his location.

I contacted several members of the SVCGET and requested their assistance on this incident. Det. Presta was directed to go to the hospital to make contact with the victim. He was assigned as the case manager. Officer Roberge was directed to assist Det. Presta. Sgt. Kittilstved and Officer Rose were requested to respond to the area to help locate the crime scene.

At approximately 0735 I arrived at 13th and Cedar and contacted Sgt. Meyer. Officer Cler was on scene. I requested that a Corporal take photographs of the vehicle the victim was in. The vehicle was a white 2006 Chevy Malibu 4 door WA lic. number ADH7408. It was parked on the north curb side of the north west corner of 13th and Cedar. Officers had crime scene tape blocking access to the vehicle and potential crime scene area by the public. I looked inside the vehicle and noticed what appeared to be a fresh blood stain on the driver's seat. The blood stain was located in the area where a driver's right hip would be if the driver were sitting down. I also noticed fresh blood stains on the back seat. I was advised that the victim had been removed from the back seat. It appeared to me that we either had two victims or the victim had originally been in the front seat and later moved to the back seat. (I later learned that witnesses said the victim had driven the vehicle away from the scene and later got into the back of the vehicle). Corp. Lasswell responded to the scene and took photographs. Sgt. Meyer and I determined that the area around the vehicle was not part of the crime scene. At that time I requested that the vehicle be secured and towed to property for a later search warrant. Sgt. Meyer advised that he would take care of it.

Sgt. Meyer advised that he had heard from Officer Hager that he had recovered a gun at the hospital. I talked briefly to Officer Hager by phone. He advised he found a gun in the female's, (Alicia Favro's) purse. He told me that she told him she had picked the gun up off of the floor of the car. At that time I requested that he take Favro to the Public Safety building where she would be contacted by Det. Presta.

Sgt. Meyer advised that patrol had found the crime scene located at 1825 W. 6th and that they were requesting me to respond to that location. I contacted Officer Roberge by phone. He advised that the victim, (Arthur Cardenas) was in surgery and would not be available to talk to for quite some time.

I responded to 1825 W. 6th and contacted Sgt. Nemic. He advised that they had determined that the crime was at 1825 W. 6th which is a duplex. He further advised that they had located a bullet hole in the fence located directly behind this address in the alley. They had also located what appeared to be two bullets lodged in the north side of the house across the alley. The address of this house is 617 S. elm. Due to the concern of potential victims inside the 6th address patrol had forced entry. No one was inside and the residence was secured. An Patrol had taped off the crime scene area which included the alley and were in the process of looking for victims and/or witnesses. An officer was assigned to watch the front of the duplex and the rear.

I talked to Officer Bode. He advised that he had talked to witness Teri Nealy who lives at 1820 W. 7th. This is a residence that sits to the south and east of 1825 W. 6th. This residence is higher up and has a clear view to the back door of 1825 W. 6th. Officer Bode stated that this witness saw a subject shooting from the back door area of 1825 W. 6th at another man running down the alley. The shooter got into the driver's seat of a white car and drove off. Shortly after the witness saw two females leave the residence carrying backpacks. They got into a gray colored Subaru type vehicle and left east bound on 6th. At this time I contacted Sgt. Kittilstved and he advised that he would start working on a search warrant for the address of 1825 W. 6th and the vehicle the victim had been in. I asked Officer Bode to assist Sgt. Kittilstved with the search warrant.

It should be noted that it was raining on the morning of the shooting. Rain was fairly constant but there were times it would let up.

*ƆƐ 4294*

| OFFICER NAME | ID NUMBER | OFFICER NAME | ID NUMBER | APPROVED BY | BOOKING APPROVED BY |
|---|---|---|---|---|---|
| Dan Ervin | 284 | | | | |

103E

REV 06/09

## ADDITIONAL NARRATIVE REPORT

PAGE 2 OF ~~3~~

| AGENCY NAME | CROSS REFERENCE NUMBER(S) | | INCIDENT NUMBER |
|---|---|---|---|
| Spokane Police Department | | | 12-125771 |
| INCIDENT CLASSIFICATION | | | DIST |
| 1st assault/shooting | | | |
| LOCATION OF INCIDENT | TYPE OF PREMISE | LOCATION NAME | # OF UNITS ENTERED |
| 1825 W. 6th, Spokane Wa | | | |

| | REPORTED ON | | | | OCCURRED ON OR FROM | | | | | OCCURRED TO | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MONTH | DAY | YEAR | TIME | DOW | MONTH | DAY | YEAR | TIME | DOW | MONTH | DAY | YEAR | TIME | DOW |
| 5 | 1 | 12 | | | 4 | 26 | 12 | | | | | | |

CODES: C - COMPLAINANT, CV - COMPLAINANT IS VICTIM, G - PARENT/GUARDIAN, P - MENTIONED IN REPORT, RO - REGISTERED OWNER. V - DECEASED, V - VICTIM, VB - VICTIM BUSINESS, W - WITNESS
SUSPECT CODES: A - ARREST, I - INSTITUTIONAL, M - MISSING, R - RUNAWAY, S - SUBJECT/SUSPECT

| CODE | NAME: LAST, FIRST MIDDLE | RACE | SEX | DOB/AGE | RESIDENCE/WORK/CELL/MESSAGE PHONE |
|---|---|---|---|---|---|
| | | | | | |

**NARRATIVE**

1825 W. 6th is 1/2 of a duplex. This address is the furthest west address. There was green grass and weeds behind this address. The grass was wet. There was a set of tire marks in the grass that appeared to be fresh. Corp. Lasswell responded to the scene. He took several photos of the area that included the tire tracks. I requested that he go to Nealy's address and take a photo from her bedroom window to show the view she had of the alley and the back of 1825 W. 6th. See his report.

Officer Rose arrived on scene. I had been told that no one was home at 617 S. Elm. I requested that he locate the home owner and advise them of the two bullets that were lodged in their house. I further asked that he request consent from the home owner to go on their property and remove those items. I was later advised that the homeowner consented to allowing us to remove the bullets. See Officer Rose' report.

Det.s Hill and Madsen of Major Crimes arrived on scene. I consulted with them and at that time it was determined that we had the scene under control and would not need their assistance at that time. Det. Hill advised he did talk to a neighbor and that he would write an additional as to what they said.

I contaced Teri Nealy at her residence. She took me to the room where she witnessed the incident. As I looked out the window I could see the back of 1825 W. 6th to include the back door landing area. Nealy told me that she got out of bed around 0530 in the morning. At 0545 her coffee was ready. Around that time she noticed a red sports car parked behind 1825 w. 6th. Two white males got out of the car. One walked up to the back door and the other walked up to the back window. It appeared as if they were checking them to see if they were locked. They got back in the car and drove off without going inside. She could not give me a description of the males except one of them was wearing a skully or beany type cap. Approximately 20 minutes later she heard a loud pop. She knew it was not fireworks. She said she is familiar with the sound of gunshots because she used to live in Las Vegas. She looked outside and saw a white male standing by the back door of 1825 W. 6th. This guy fired two shots at a male that was running east down the alley. She said the guy on the front porch had on a white shirt and the guy running had on a black colored shirt. She did not get a good look at the guy running down the alley. The guy firing the gun hunched over and got into the driver's seat of a white car and drove off. A couple minutes later two females came out of the house each carrying a backpack. They got into a gray colored Subaru type car and drove off east on 6th. It should be noted that Nealy appeared to be nurvous and shaking as she reported this information to me.

I went to the back door landing area of 1825 W. 6th and looked to the south. There is a solid wooden fence across the alley that fences in the back yard of 617 S. Elm. I could see a small hole in this fence at looked like a bullet hole. The back door area of 617 S. Elm sticks out a few feet from the back of the house like a small entry area. Officers pointed out where they saw a bullet lodged in the north side of this area. From the back door landing area of 1825 W. 6th I could line up the hole in the fence with the bullet lodged in the back entry area of the Elm address. It appeared to me that it was probable that the bullet that made the hole in the fence was the same one that had lodged in the back door area of the Elm address.

The fence to the Elm address has a gate located at the back corner. This would be the North East corner of the residence and the gate attatches to that corner. A couple feet to the west of the gate at approximately two feet high on the sideing of this residence there was a second bullet lodged in the siding of the residence. There is a clear line of sight from this location to the back door landing area of 1825 W. 6th.

Melissa Diamanti a Specialist from the forensics unit arrived on scene to help us process the scene. She took overall photographs of 1825 W. 6th evidence photos and measurements, and assisted with the documentation and overall processing of the scene. See her report.

Sgt. Kittilstved advised that he had a signed search warrant for the residence. We waited for him to arrive on scene before making entry. We conducted a knock and announce, made entry and cleared the residence. No one was inside. It should be noted that the front door had damage from entry being forced earlier by patrol.

The duplex had two levels. There was a main floor and a stairway leading upstairs that is located just inside the front door. There were boxes sitting in the living room. It appeared that the resident was either moving into the duplex or moving out. All the cupboards were empty, and there was little furnature.

| OFFICER NAME | ID NUMBER | OFFICER NAME | ID NUMBER | APPROVED BY | BOOKING APPROVED BY |
|---|---|---|---|---|---|
| Dan Ervin | 284 | | | | |

103E

REV 08/99

## ADDITIONAL NARRATIVE REPORT

PAGE 3 OF 4

| | | | | |
|---|---|---|---|---|
| AGENCY NAME<br>Spokane Police Department | CROSS REFERENCE NUMBER(S) | | INCIDENT NUMBER<br>12-125771 | |
| | | | | DIST |
| INCIDENT CLASSIFICATION<br>1st assault/shooting | | | | |
| LOCATION OF INCIDENT<br>1825 W. 8th, Spokane Wa | TYPE OF PREMISE | LOCATION NAME | | # OF UNITS ENTERED |

| | REPORTED ON | | | | | OCCURRED ON OR FROM | | | | | OCCURRED TO | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MONTH | DAY | YEAR | TIME | DOW | MONTH | DAY | YEAR | TIME | DOW | MONTH | DAY | YEAR | TIME | DOW |
| 5 | 1 | 12 | | | 4 | 26 | 12 | | | | | | |

CODES: C – COMPLAINANT, CV – COMPLAINANT IS VICTIM, G – PARENT/GUARDIAN, P – MENTIONED IN REPORT, RO – REGISTERED OWNER, V – DECEASED, V – VICTIM, VB – VICTIM BUSINESS, W – WITNESS
SUSPECT CODES: A – ARREST, I – INSTITUTIONAL, M – MISSING R – RUNAWAY, S – SUBJECT/SUSPECT

| CODE | NAME: LAST, FIRST MIDDLE | RACE | SEX | DOB/AGE | RESIDENCE/WORK/CELL/MESSAGE PHONE |
|---|---|---|---|---|---|
| | | | | | |

Entry was made at approximately 1136 hours. The duplex was somewhat cluttered on the main floor because of the moving boxes. The main floor had a living room area, a small eating area that connected to both the kitchen and the living room. As I started to search I noticed that very little had been unpacked. On the kitchen counter I saw several purses that still had their price tags on them. Sticking out of one of the purses was a Ruger brand pellet gun. This item was photographed and later collected as evidence. By the kitchen sink I observed two cigarette butts sitting together. I collected these items as evidence. In one of the boxes on the kitchen floor I located some paperwork that had names Nancy Davis and Skye Castillo on it. I collected these items as evidence. In the living room area officers located a hole in the north wall that looked like a large bullet hole. It was just below the window. On the floor below the hole was what appeared to be parts of a jacketed bullet. The jacket (placard B) had separated from the lead (placard A) and was sitting on the floor next to the lead. To the right of this was a glass light fixture that had glass leaves on it. It appeared as if the bullet may have struck a leaf before hitting the curtain by the window. There was a stretch mark on the curtain that had a dark color on it consistent with the color of lead. There was not a hole in the curtain. It appeared that after the bullet went through the glass leaf it struck the curtain and then struck the sheet rock wall. The curtain stretched and was able to keep the bullet from lodging inside the wall. When the curtain contracted from the stretching it pulled the bullet from the wall and allowed it to drop on the floor. The curtain as well as the bullet fragments and jacket were photographed and later taken as evidence.

In the living room area I located a .40 caliber shell casing. It was on the floor sitting between a couple of boxes. This casing was closer to the east wall of the living room that the west wall. It was also closer to the south wall than the north. This casing was photographed and later collected as evidence. I located a .380 caliber shell casing in the living room. This casing was close to the west wall of the living room. It was photographed and later collected as evidence. It should be noted that items of evidence in the living room were marked with letter placards, photographed, and their location later measured in order to show where each item was located. Other Detectives located items of evidence that were documented in the same way. Once they were identified and documented I assisted with packaging them and turning them over to Sgt. kittilstved. Officer Rose located a .380 shell casing in the back yard area. Once it was photographed I collected it as evidence.

Once we had finished searching the residence I went over to 617 S. Elm with Melissa Diamanti where we removed the bullets that were lodged in the siding of the residence. In both cases I took a saw and cut a square portion of the siding around the bullet from the house. The first bullet I recovered was the one by the back door. Placard (M) It remained lodged in the siding. The second bullet I recovered from the wood behind the siding. Placard (N) The bullet had passed through the siding and lodged into this wood. The wood was cracked and split. I was able to remove this bullet without touching it with any tools. Photographs were taken of the siding after each piece was cut out. These items were collected as evidence. It should be noted that these bullets appeared to be solid jacketed. Once all items of evidence were collected and the residence was secured.

At approximately 1445 I received a voice message from Sgt. Nemic that advised he received information from Sacred Heart Hospital that the AMR employee that had pulled the victim from the vehicle had burn marks on his body and was having respiratory problems. I called the hospital and was advised of the same information and they asked if we had found anything in the vehicle that would indicate there were chemicals or other toxic substances in the vehicle. Hospital staff were concerned about the welfare of the AMR employee and advised they were not sure the exact treatment to give him. Our search warrant included the vehicle. It had been placed in property but had not been searched. I contacted the fire department and advised them of the situation and requested that they respond to check and see if anything toxic was in the vehicle or the victim's clothing. I went to property and moved the car close to the roll up door so that the fire department could check it for toxic substances.

At approximately 1544 hours the fire department hazardous materials team arrived at the property facility. I briefed the team about the situation and requested that they check the victim's clothing for hazardous materials.

DE v784

| OFFICER NAME<br>Dan Ervin | ID NUMBER<br>284 | OFFICER NAME | ID NUMBER | APPROVED BY | BOOKING APPROVED BY |
|---|---|---|---|---|---|

103E

REV 00/09

## ADDITIONAL NARRATIVE REPORT

PAGE 4 OF 4

| AGENCY NAME | CROSS REFERENCE NUMBER(S) | | INCIDENT NUMBER |
|---|---|---|---|
| Spokane Police Department | | | 12-125771 |

INCIDENT CLASSIFICATION
1st assault/shooting

DIST

| LOCATION OF INCIDENT | TYPE OF PREMISE | LOCATION NAME | # OF UNITS ENTERED |
|---|---|---|---|
| 1825 W. 6th, Spokane Wa | | | |

| REPORTED ON | | | | OCCURRED ON OR FROM | | | | OCCURRED TO | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MONTH | DAY | YEAR | TIME | DOW | MONTH | DAY | YEAR | TIME | DOW | MONTH | DAY | YEAR | TIME | DOW |
| 5 | 1 | 12 | | | 4 | 26 | 12 | | | | | | | |

CODES: C – COMPLAINANT, CV – COMPLAINANT IS VICTIM, G – PARENT/GUARDIAN, P – MENTIONED IN REPORT, RO – REGISTERED OWNER, V – DECEASED, V – VICTIM, VB - VICTIM BUSINESS, W – WITNESS
SUSPECT CODES: A – ARREST, I – INSTITUTIONAL, M – MISSING, R – RUNAWAY, S – SUBJECT/SUSPECT

| CODE | NAME: LAST, FIRST MIDDLE | RACE | SEX | DOB/AGE | RESIDENCE/WORK/CELL/MESSAGE PHONE |
|---|---|---|---|---|---|
| | | | | | |

I advised them that we had a search warrant for the vehicle and that we wanted to have the vehicle checked for hazardous materials as well. I advised them the clothing, vehicle and contents were evidence in a shooting and that we still had to process and collect evidence from the vehicle. I asked them to be as minimally intrusive as they could so the evidence would not be disturbed. The firemen involved in this incident were: Response Chief Dave Hayworth, Operations Director Schott Himmelspech, Safety Officer Andy Mcleod, Decon Officer Jason Reser, Medic Officer Dary Williams, and the two entry officers were Russ Butters and Mike Ramos.

Detective Presta arrived on scene and stayed with the fire department while they conducted their tests. I had to leave the scene at approximately 1445 hours. He later advised that nothing hazardous was found on the clothing or in the car. He further advised that the fire department had found a safe in the trunk and that safe contained a large amount of U.S. Currency and what appeared to be methamphetamine. I told him that we would have to amend the search warrant in order to collect those items.

On 4/27/12 at approximately 1520 hours Detective Presta and I responded back to property to execute the amended search warrant on the victim vehicle. Forensics responded to the scene to process the car for fingerprints. Once they had collected fingerprints around the trunk area Det. Presta and I began to search the trunk. Towards the back of the trunk I located a safe that had the door pried open. Inside the safe there was a blue colored money bag. Det. Presta took control of the bag while I continued to search. I also located in the safe a red Christmas type bag. Inside this bag there were several rubber bands. There was a black plastic bag that contained a plastic container with a blue lid. Inside that container I located a ziplock bag that contained three sandwich bags. One sandwich bag contained tied off plastic baggies which contained a crystal substance believed to be methamphetamine. One sandwich bag contained 8 tied off baggies which contained a crystal substance believed to be methamphetamine. Once sandwich bag contained 6 tied off sandwich baggies which contained a crystal substance believed to be methamphetamine. I had these items photographed and then weighed each of them using the scales at property. The 4 tied off baggies showed a weight of 15.2, 15.8, 15.1, and 15.2 grams. I field tested a small portion of one of these baggies and it field tested positive as methamphetamine. The 8 tied off baggies showed a weight of 8.3, 8.4, 8.1, 8.1. 8.5, 8.3, 8.4, and 8.0 grams. The 6 tied off baggies showed a weight of 29., 29.3, 28.9, 29.4, 29.4, and 28.6 grams. The contents of all of these baggies was placed into one baggie to be placed on property. I took all of the baggies that contained the methamphetamine and placed them in one bag so they could be processed for fingerprints. The safe along with all of the packaging material were collected as evidence and marked to be processed for fingerprints. These items were turned over to Det. Presta so they could be placed on property. It should be noted that the safe door had been pried open in such a way that the front was damaged. No safe parts were located in the trunk which would indicate that it was pried open at another location.

Det. Presta remained on scene and I had to leave for a short period of time. While I was gone Det. Presta advised that he had found what he believed to be a hand grenade in the trunk of the car. He had contacted Sgt. Kittilstved and requested that he respond. This eventually led to having the bomb squad respond to the scene. The bomb squad collected the device. See Sgt. kittilstved's report.

Once the device was made secure I assisted Det. Presta with the rest of the search of the vehicle. I helped him package the evidence. all items were placed on property.

| OFFICER NAME | ID NUMBER | OFFICER NAME | ID NUMBER | APPROVED BY | BOOKING APPROVED BY |
|---|---|---|---|---|---|
| Dan Ervin | 284 | | | | |

103E

REV 06/09